942 N.E.2d 867 (2011)
In the Matter of the Termination of the Parent-Child Relationship of D.B., Minor Child.
W.B., Father, Appellant-Respondent,
v.
Indiana Department of Child Services and Lake County Court Appointed Special Advocate, Appellees-Petitioners.
No. 45A03-1005-JT-285.
Court of Appeals of Indiana.
January 31, 2011.
*869 Joann M. Price, Merrillville, IN, Attorney for Appellant.
Eugene M. Velazco, Jr., DCS Lake County Office, Gary, IN, Robert J. Henke, DCS Central Administration, Indianapolis, IN, Attorneys for the Indiana Department of Child Services.
Donald W. Wruck, Dyer, IN, Attorney for Court Appointed Special Advocate.

OPINION
BROWN, Judge.
W.B. ("Father") appeals the involuntary termination of his parental rights to his child, D.B. Concluding that there is insufficient evidence to support the juvenile court's judgment, we reverse.

Facts and Procedural History
Father is the biological father of D.B., born in May 2002.[1] The evidence most favorable to the juvenile court's judgment reveals that in May 2007, while tending to an unrelated matter at the Merrillville Police Department, Mother was arrested on an outstanding warrant issued in Gary. When Mother was placed under arrest, she informed the police officers that her children were alone in a car parked outside. The local Lake County office of the Indiana Department of Child Services ("LCDCS") was notified and subsequently took D.B. and five of her siblings into protective custody. All six children were thereafter placed either with their biological fathers or in relative foster care. D.B. and two of her siblings were placed together with a maternal second cousin. At the time of the children's detention, Father, *870 whose whereabouts were unknown, lived in South Bend with his wife and two children.
Mother was released from incarceration and, in June 2007, began participating in court-ordered reunification services. Once Father was located, he began to participate in visitation with D.B., but did not get involved with any other services as Mother was "on track" with regaining custody of D.B. Transcript at 40. In November 2007, however, Mother was arrested and incarcerated on felony auto theft and attempted check fraud charges. Mother subsequently entered a plea agreement and remained incarcerated until May 2009.
Meanwhile, upon learning of Mother's arrest and incarceration, Father immediately began participating in a variety of court-ordered services, in addition to visitation with D.B., in order to gain custody of D.B. These services included parenting classes, individual and family counseling, and home-based services. Father also completed substance abuse classes after testing positive for marijuana "in the beginning" of the case. Id. at 55. Father successfully completed all court-ordered services, including six months of clean random drug screens following his successful completion of the substance abuse classes. Consequently, D.B. was placed in Father's care in December 2008.
Two weeks after D.B.'s placement with Father, Father was laid-off from his job. At the time, Father was living and working in Hammond. In addition, NIPSCO cut off utility services to Father's apartment after discovering the account was in a former tenant's name. Father was unable to reinstate utility service in his apartment due to an outstanding unpaid bill with NIPSCO that he could not afford to re-pay at that time.
Father continued to maintain contact with LCDCS caseworkers and cooperate with service providers while attempting to find new employment. Because Father feared LCDCS would remove D.B. from his care if they became aware of his situation, however, he allowed caseworkers to believe he still lived in his apartment in Indiana by telling "little lies" rather than disclosing that he had temporarily moved in with extended family members just across the Indiana/Illinois border. Id. at 151. After approximately two weeks, Father informed D.B.'s therapist, Laura Uzelac ("Uzelac"), during a home visit at the Indiana apartment that he planned to take D.B. back to his family's home in Illinois "because it was warm" there. Id. at 83. Uzelac shared this information with LCDCS case manager Elizabeth Hufford ("Hufford"),[2] and D.B. was removed from Father's care several days later in January 2009. LCDCS attempted to reach an interstate compact agreement with the State of Illinois, pursuant to the Interstate Compact on the Placement of Children ("ICPC"),[3] but the ICPC agreement was ultimately denied by Illinois due to Father's wife's criminal history and the family's ongoing financial instability.
Father continued to seek stable employment while participating in court-ordered services and regularly visiting with D.B. *871 Father obtained several factory jobs, but was repeatedly laid off due to the economy. Father also worked for a temporary agency. Eventually, Father separated from his wife and began living with his own father, stepmother, and two step brothers, in a four-bedroom home located in Calumet, Illinois.
In June 2009, LCDCS filed a petition seeking the involuntary termination of Father's parental rights. An evidentiary hearing on the involuntary termination petition was held on January 26, 2010. At the time of the termination hearing, Father continued to live with his father and remained largely unemployed, working for a temporary agency on sporadic job assignments. In addition, dissolution of marriage proceedings involving Father and his wife had been initiated and Father's divorce was expected to be finalized "in the near future." Id. at 57. Although LCDCS case workers could not recommend reunification at the time of the termination hearing due to Father's current economic instability, there was a general consensus among case workers and service providers that Father was capable of parenting D.B. and had never harmed the child either physically or emotionally.
At the conclusion of the termination hearing, the juvenile court took the matter under advisement. On April 9, 2010, the court entered its judgment terminating Father's parental rights to D.B. Father now appeals.

Discussion and Decision
Initially, we note our standard of review. This court has long had a highly deferential standard of review in cases concerning the termination of parental rights. In re K.S., 750 N.E.2d 832, 836 (Ind.Ct.App.2001). When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. In re D.D., 804 N.E.2d 258, 264 (Ind.Ct.App.2004), trans. denied. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. Id.
In the instant case, the juvenile court made specific findings and conclusions in its termination order. When a juvenile court enters specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. Bester v. Lake Cnty. Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005). In deference to the juvenile court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. In re L.S., 717 N.E.2d 204, 208 (Ind.Ct.App.1999), trans. denied; see also Bester, 839 N.E.2d at 147.
"The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." In re M.B., 666 N.E.2d 73, 76 (Ind. Ct.App.1996), trans. denied. Although parental rights are of a constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. In re R.H., 892 N.E.2d 144, 149 (Ind.Ct.App.2008). In Indiana, before parental rights may be involuntarily terminated, the State is required to allege and prove, among other things, that:
(B) there is a reasonable probability that:
(i) the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied; or

*872 (ii) the continuation of the parent-child relationship poses a threat to the well-being of the child; [and]
(C) termination is in the best interests of the child....
Ind.Code § 31-35-2-4(b)(2).[4]
The State's burden of proof for establishing these allegations in termination cases "is one of `clear and convincing evidence.'" In re G.Y., 904 N.E.2d 1257, 1260-1261 (Ind.2009) (quoting Ind. Code§ 31-37-14-2 (2008)). "[I]f the State fails to prove any one of these statutory elements, then it is not entitled to a judgment terminating parental rights." Id. at 1261. Father challenges the sufficiency of the evidence supporting the juvenile court's findings pertaining to subsections b(2)(B) and b(2)(C) of the termination statute set forth above. Because we find it to be dispositive, however, we limit our discussion to Father's allegations of error pertaining to subsection (b)(2)(B) of Indiana's termination statute. See Ind. Code § 31-35-2-4.
In challenging the sufficiency of the evidence supporting the juvenile court's determination that (1) there is a reasonable probability the conditions resulting in D.B.'s removal and continued placement outside Father's care will not be remedied and (2) that continuation of the parent-child relationship poses a threat to D.B.'s well-being, Father claims that the juvenile court's specific findings were inaccurate and, when "considered collectively, the inferences that the [juvenile] court drew were general and gross mischaracterizations of the evidence...." Appellant's Brief at 9. In addition, although Father admits his dishonesty regarding taking D.B. to Illinois without LCDCS's permission after losing his job in 2009 was not "acceptable," he nevertheless contends the juvenile court's findings erroneously suggest he "attempted to abscond with [D.B.]" and to "conceal" her whereabouts from LCDCS when the evidence clearly shows Father was merely attempting to provide D.B. with a "safe and warm home" and that no evidence suggesting "any other malfeasance by Father" was ever presented. Id.
A parent's interest in the care, custody, and control of his or her children is arguably one of the oldest of our society's fundamental liberty interests. Bester, 839 N.E.2d at 147. Hence, the traditional right of parents to establish a home and raise their children is sheltered by the Fourteenth Amendment of the United States Constitution "against the State's unwarranted usurpation, disregard, or disrespect." M.L.B. v. S.L.J., 519 U.S. 102, 116, 117 S.Ct. 555, 564, 136 L.Ed.2d 473 (1996). A case involving the State's authority to permanently sever a parent-child bond therefore demands the close consideration the Supreme Court has long required when a family association so undeniably important is at stake. Id. at 116-117, 117 S.Ct. 555.
The purpose of terminating parental rights is not to punish the parent but to protect the children involved. K.S., 750 N.E.2d at 832. Moreover, an involuntary termination of parental rights is the most extreme sanction a court can impose on a parent because termination severs all rights of a parent to his or her children. In re R.H., 892 N.E.2d at 149. Termination of parental rights is therefore intended as a last resort, available only when all other reasonable efforts have failed. Id.
*873 In determining whether there exists a reasonable probability that the conditions resulting in a child's removal or continued placement outside a parent's care will not be remedied, a juvenile court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. In re J.T., 742 N.E.2d 509, 512 (Ind.Ct.App. 2001), trans. denied. The court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." Id. Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. A.F. v. Marion County Office of Family & Children, 762 N.E.2d 1244, 1251 (Ind.Ct.App.2002), trans. denied. A juvenile court may also properly consider the services offered to the parent by a county department of child services and the parent's response to those services as evidence of whether conditions will be remedied. Id.
Here, in terminating Father's parental rights to D.B., the juvenile court specifically found Father had "tested positive for marijuana throughout the case." Appellant's Appendix at ii (emphasis added). The court also found Father "did not participate in individual counseling, he was sporadic with his visitation, he was dirty for his drug screens, and he lied as to where he lived." Id. Finally, the court found Father "failed to fully comply with the case plan." Id. A thorough review of the record, however, reveals that these findings are not supported by clear and convincing evidence.
The record reveals that although Father tested positive for marijuana at the beginning of the CHINS case, he did not test positive on any subsequent drug screens throughout the remaining two years of the underlying proceedings. In addition, Father successfully completed a substance abuse program and thereafter submitted to six consecutive months of random drug screens. When asked during the termination hearing whether LCDCS had any "ongoing concern with substance abuse with respect to [F]ather," case manager Hufford explained that there were some "initial issues" with marijuana, but that Father thereafter "tested clean" for six months and LCDCS later "dismissed" that service. Transcript at 55. Father likewise confirmed that he had not used marijuana "since the first time that I tested positive" and further informed the juvenile court, "[T]hat was a wake up for me. I wasn't going to mess up like that." Id. at 145. Thus, the juvenile court's specific finding that Father "tested positive for marijuana throughout the case" is not supported by the evidence. Appellant's Appendix at ii.
Regarding Father's participation in the case plan and court-ordered services, the record reveals Father successfully completed parenting classes and consistently participated in individual counseling for over a year until LCDCS cancelled this service due to Father's relocation to Illinois. In addition, although Hufford initially testified that Father had been inconsistent in visiting with D.B. and had canceled visits "[m]aybe once a month," she later admitted Father had missed only a total of six (6) out of forty-one (41) scheduled visits throughout the entire case. Transcript at 66. Father acknowledged missing several scheduled visits with D.B.; however, he explained that his missed visits were oftentimes due to requests from a "lady that worked in the office" to change his regularly-scheduled Thursday visits to some other date which Father could not always *874 accommodate due to his work schedule with the temporary agency. Id. at 146. This was especially true if the request was for a Saturday visit, because the weekend visits took place in a different office which was not on the public bus route.[5] In such cases, Father reported that it was usually mutually decided to postpone the visit until the next week. As for December 2009, Father indicated he wanted to see D.B. and "had a gift for her and everything," but was told the Christmas visit would have to wait until the following week when Father's work commitment made it impossible for him to switch to a different date as requested by the office earlier that week. Id. at 148. Thus, the juvenile court's findings that Father "did not participate in individual counseling" and was "sporadic with his visitation" are also not supported by the evidence. Appellant's Appendix p. ii.
Finally, the general consensus among case workers and service providers was that Father is quite capable of parenting D.B., but for his recent economic instability, and does not pose a threat to the child's well-being. During the termination hearing, Hufford described Father's attitude as "cooperative" and acknowledged Father "hadn't done anything to ... harm [D.B.], in the sense of ... physical, mental abuse, emotional abuse, anything like that." Transcript at 61, 65. When asked if, "at this point in time, [Father is] able to properly parent [D.B.]," Hufford answered, "Yes, I think he could properly parent her." Id. at 65. Additionally, when asked whether she believed Father's relationship with D.B. posed a threat to the child or her well-being, Hufford replied, "No" in both instances. Id. at 67. Hufford thereafter acknowledged that her recommendation for termination was based solely on the facts "[Father], um, at this time, doesn't have a, a consistent source of income and housing" and "has not been consistent with services." Id.
Therapist Uzelac's testimony echoed that of Hufford's. When asked to describe Father's attitude while she was working with him, Uzelac replied, "[Father] was very nice. He's patient[.] [H]e was kind.... [H]e was never negative or aggressive or anything. He was very nice." Id. at 98. When asked whether Father had a "disposition about him that he's willing to [be] open to learning and being told things," Uzelac answered, "Yes. Yes." Id. at 99. Thus, the juvenile court's determination that continuation of the parent-child relationship poses a threat to D.B.'s well-being is also without evidentiary support.
Based on the foregoing, we conclude that the evidence of record presented by LCDCS falls substantially short of that necessary to involuntarily terminate Father's constitutionally protected parental relationship with D.B. Several of the juvenile court's findings, including the court's findings that Father tested positive for drugs throughout the case, did not participate in counseling, and was sporadic with his visitation with D.B., are simply not supported by the evidence. Without such findings, the juvenile court's conclusions that the conditions resulting in D.B.'s removal and/or continued placement outside Father's care will not be remedied and that continuation of the parent-child relationship poses a threat to D.B.'s well-being are clearly erroneous.
We readily acknowledge that there is no guarantee Father will achieve lasting financial stability. This factor considered alone, or in combination with the fact Father *875 lied to caseworkers in 2009 about where he was living, however, is not a valid basis for terminating the relationship between a natural parent and his child. See Rowlett v. Vanderburgh Cnty. Office of Family & Children, 841 N.E.2d 615, 623 (Ind.Ct.App.2006) (stating that stability of environment is an important factor in the matter of raising children but in and of itself does not serve as a valid basis for terminating parental rights), trans. denied.[6] Moreover, although we are keenly aware of the fact D.B. is currently living and thriving in a loving, pre-adoptive relative foster home, a parent's constitutional right to raise his or her own child may not be terminated solely because there is a better home available for the child. K.S., 750 N.E.2d at 836.

Conclusion
The law makes abundantly clear that termination of a parent-child relationship is an extreme measure to be used only as a last resort when all other reasonable efforts to protect the integrity of the natural relationship between parent and child have failed. Rowlett, 841 N.E.2d at 623. Given the circumstances before us, we do not believe that this case has reached the "last resort" stage. We therefore reverse the juvenile court's judgment and remand this cause for further proceedings under its previous CHINS orders.
Reversed.
ROBB, C.J., and RILEY, J., concur.
NOTES
[1] The juvenile court also terminated the parental rights of D.B.'s biological mother, M.C. ("Mother"), in its April 2010 judgment. Mother does not participate in this appeal. Consequently, we limit our recitation of the facts to those pertinent solely to Father's appeal.
[2] For clarification purposes, we observe that although named in the Transcript and Table of Contents as "Elizabeth Hufford," the parties, witnesses, and attorneys all referred to LCDCS case manager Hufford during the termination hearing as "Miss Grady." See, e.g., Transcript at 68.
[3] ICPC is an agreement which has been adopted by statute in all fifty states and is designed to regulate the interstate movement of minors by public and private agencies. An interstate compact must be approved by both the "originating" state and "receiving" state before a child can legally leave the originating state.
[4] Ind.Code § 31-35-2-4 was amended by Pub.L. No. 21-2010, § 8 (eff. March 12, 2010). The changes to the statute, however, became effective following the filing of the termination petition herein and thus are inapplicable to this case.
[5] Father testified that when he separated from his wife, he allowed her to take the family car so that she could better care for their children. Consequently, he was forced to rely on "the bus" or "[his] feet" to get to visits with D.B. Transcript at 146.
[6] Notwithstanding our holding here, we pause to emphasize that this court in no way condones Father's admittedly unacceptable decision in December 2009 to lie to caseworkers and take D.B. across state lines without prior permission from LCDCS. Nevertheless, the juvenile court's specific finding that Father "lied as to where he lived," albeit technically correct, suggests a more pervasive pattern of deception by Father than what actually occurred in this particular case and likewise cannot serve as the sole basis for termination of Father's parental rights.