**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEY FOR APPELLANT MOTHER:

**LENEIGHA DOWNS**
Deputy Public Defender
Bloomington, Indiana

ATTORNEY FOR APPELLANT FATHER:

**AMY PAYNE**
Deputy Public Defender
Bloomington, Indiana

ATTORNEYS FOR APPELLEE:

**ANNA M. SEBREE**
DCS Monroe County Local Office
Bloomington, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

FILED
May 28 2013, 9:31 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

IN RE THE TERMINATION OF THE        )
PARENT-CHILD RELATIONSHIP OF        )
S.B. (Minor Child) and              )
                                    )
A.B. (Mother) and D.B. (Father),    )
                                    )
    Appellants-Respondents,         )
                                    )
      vs.                         )    No. 53A01-1208-JT-341
                                    )
THE INDIANA DEPARTMENT OF CHILD     )
SERVICES,                           )
                                    )
    Appellee-Petitioner.            )

APPEAL FROM THE MONROE SUPERIOR COURT
The Honorable Stephen R. Galvin, Judge
Cause No. 53C07-1112-JT-901

**May 28, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**CRONE, Judge**

**Case Summary**

A.B. ("Mother") and D.B. ("Father") appeal the trial court's involuntary termination of their parental rights to their child, S.B.[1] We affirm.

**Facts and Procedural History**

On December 19, 2011, the Indiana Department of Child Services ("DCS") filed its petition to terminate parental rights. An evidentiary termination hearing was held on April 30 and June 7, 2012. In its termination order, dated July 11, 2012, the trial court made the following findings of fact relevant to its termination of parental rights with respect to S.B.:[2]

1. Mother and Father are the parents of S.B., born January 25, 2003; C.B., born April 15, 2008; and M.B., born December 10, 2009.

2. Mother and Father are also the parents of Ma.B., age 16, and Sh.B., age 12.

3. Carol and Paul Heerdink cared for Ma.B. for most of the first 4 ½ years of his life. They also cared for Sh.B. until she was three years old.

4. When S.B. was born in 2003, she had a significant heart problem which the parents were not prepared to address. Like Ma.B. and Sh.B., the Heerdinks took S.B. into their home. The Heerdinks ensured that S.B. got the appropriate medical care that she required. S.B. was on two medications and required feeding every hour. The parents rarely saw the child. The Heerdinks cared for S.B. for the first 26 months of her life.

---

[1] While the trial court's order also terminated parental rights with respect to two additional children, C.B. and M.B., the parties subsequently reached a settlement agreement and the trial court vacated its termination with respect to those children on March 19, 2013. Accordingly, the parties' appeals with respect to those children were dismissed with prejudice by this Court on April 16, 2013. The appeal with respect to S.B. proceeds.

[2] The trial court's order often refers to the parties by their full names. We use "Mother," "Father," and the initials of each minor child where appropriate.

2

5.  In April, 2005, Mother and Father picked S.B. up for a visit. They took the child to West Virginia. Although the Heerdinks were afraid for S.B. and the other children, they had no legal right to intervene. After S.B. developed pneumonia, the Heerdinks traveled to West Virginia and nursed the child back to health. Mother, Father, and the children returned to Indiana in the fall of 2005. The Heerdinks provided beds, dishes, and food to the family. They regularly cared for S.B. for 2 to 3 days at a time. They took S.B. to her yearly visits at Riley Hospital. They continued to provide food, clothing, Christmas gifts, and birthday gifts for the children until the children were removed from their parents in 2009.

6.  On May 22, 2009, Ma.B., Sh.B., C.B., and S.B. were removed from their parents' care after the Monroe County Department of Child Services received a report that Mother and Father were under the influence of drugs while caring for their children. Sh.B., and S.B. tested positive for cocaine and benzoylecgonine, a metabolized form of cocaine. Drug paraphernalia in the apartment was within reach of the children. MaB. had missed 49 days of school. Sh.B. had missed 19 days.

7.  The children were placed in foster care with Raymond and Veda Davis. They remained in the Davis home for the next seven months.

8.  The children were found to be Children in Need of Services on October 6, 2009.

9.  A Dispositional Order was issued on November 23, 2009….

10. Mother and Father received drug treatment and complied with all court-order[ed] services. The children were returned to their parents' home on a trial basis on December 20, 2009.

11. The CHINS cases were dismissed on April 12, 2010.

….

13. Mother and Father had no refrigerator, stove, silverware, or bowls. Mr. Davis provided these items to the parents. Raymond Davis would take food to the children when they said they were hungry. He provided food to the family every two weeks.

3

14. On or about December 11, 2010, Mother, Father, and some of the children were forced to move to the Scottish Inn Motel in Bloomington, Indiana after their trailer caught fire.

15. On December 15, 2010, Father was taken to Bloomington Hospital due to his drug use. Mother testified that she called for an ambulance because Father collapsed and was "siezuring"[sic]. Father admitted to using methamphetamine. He also admitted to having an ongoing drug problem. He told a DCS caseworker that, if given a drug screen, it would be dirty. However, he refused to take the drug test. He admitted to using methamphetamine and then caring for the children. Mother admitted to smoking methamphetamine on the previous evening while three of her children were in her care. She also stated that she has a drug problem. She refused to participate in drug treatment. She stated that she is not ready to grow up. Mother was also suffering from mental illness. She inflicted wounds on herself when told that Father would be leaving her.

16. All five children were removed from their parents' care and Children in Need of Services proceedings were initiated. All five children were placed in the home of Raymond and Veda Davis. S.B., C.B., Ma.B., and Sh.B. have continued to reside in the Davis home since their removal.

….

21. A Dispositional Hearing was held on May 9, 2011….

22. Following the Dispositional Hearing, Father tested positive for Hydrocodone on July 20th, and July 28, 2011. However, he testified that his drug of choice at this time was heroin. Mother tested positive for Hydrocodone on July 28, August 4, and October 25, 2011.

23. In late October or early November 2011, Mother informed DCS caseworker Jessica Freeman that she had begun to take Suboxone as part of her substance abuse treatment. She continued to report to Ms. Freeman that she was taking her Suboxone on a regular basis. However, Mother tested positive for Hydrocodone on January 30, 2012. After being confronted with this positive test, she initially denied her drug use. However, at a hearing on February 13, 2012, she admitted that she had in fact used Hydrocodone. At the termination fact-finding hearing, Mother testified that she was taking Suboxone regularly, but

4

briefly went off of the Suboxone to use Hydrocodone. The Court does not accept Mother's testimony as truthful.

24. Father tested positive for marijuana on January 30, 2012. Father initially lied to Jessica Freeman about using marijuana on this occasion because he "knew it would be a big ordeal." Father minimizes his drug use. He argues that marijuana is not a hard-core drug. He does not see his marijuana use as part of his larger addiction problem. He testified that he used marijuana because he had trouble sleeping.

25. For approximately 8 months, Dr. Raymond Peters, a physician practicing in Greencastle, Indiana, treated Mother for several ailments, including diabetes, hypertension, back pain, chest pain, and high blood pressure. As part of the treatment, Dr. Peters prescribed narcotics for Mother. Prior to prescribing these drugs, Mother informed Dr. Peters that she had previously taken Suboxone, but was no longer using Suboxone. On February 8, 2012, Dr. Peters notified Mother that he would no longer prescribe controlled substances for her. An INSPECT report showed that Mother had obtained a 30 day supply of Suboxone just 14 days before Dr. Peters prescribed narcotics (Lortabs) for her on January 26, 2012.

26. Mother subsequently tested positive for Butalbital, a barbiturate, on February 8, 2012, and Hydrocodone on March 28, 2012. There is no credible evidence that Mother had a valid prescription for these substances.

27. Mother and Father failed to appear for drug screens on three separate occasions during the month of April 2012. They also missed three visits with the children.

28. Mother and Father testified that they did not provide these drug screens because they could not afford to travel to Bloomington from Greencastle. However, they testified that they could afford to travel to Kentucky for two days to attend a funeral during April. Further, Father testified that he has a good job and can afford a large house for the children. Although he testified that he does not have a driver's license, Father obviously has transportation to and from his place of employment. Father and Mother have no discernible transportation difficulties except when asked to provide drug screens. Father also testified that he could not provide screens because he was working. He

provide[d] no verification of his hours worked on the days he was asked to screen.

29. For the last three years, Mother and Father have been under almost constant court supervision, both criminal and civil, requiring them to provide regular drug screens. They are well aware that they must screen when requested or the screens will be considered positive. They are also aware that they have 24 hours to comply with each request. The testimony of Mother and Father on this issue is not credible.

30. Immediately following a review hearing on April 30, 2012, DCS caseworker Jessica Freeman asked Mother and Father to take drug screens. Ms. Freeman had the swabs for conducting the screens in her possession. Mother and Father refused. They did agree to take drug screens on May 2. They failed to appear for the screens. They also failed to appear for screens on May 16 and May 31, 2012. They did participate in screens on May 7 and June 5, 2012. Mother's May 7 screen was negative. However, she testified that she was still taking her Suboxone and Clonidine. Neither appeared on the screen. The results of the June 5 screen are not yet known.

31. Mother does not believe that her children should have been removed from her care in 2009 or 2010. She testified that the children were removed from her care in 2009 based on "suspected drug use." She testified that she "pled guilty to neglect" in 2009 because she left the children at a place they should not have been. She testified that she has "no clue" as to why the children were removed in 2010. She also testified that she never used drugs around the children. She states that she only said this to the DCS caseworker because she was "scared."

32. Mother testified that she "did have" a drug problem. However, she is adamant that she no longer has a drug problem.

33. The Court does not accept Mother's testimony as truthful.

….

37. Father testified that he had "a drug problem for 18 months." He states that he was on heroin and hard drugs in 2011. He notes that, other than his ongoing drug use, he has done everything that has been ordered. He argues that, since the removal of his children, he has not used drugs to get high.

6

38.	Father testified that Mother does not use illegal drugs.

39.	Father has completed substance abuse treatment.  He testified that he will call his therapist if he relapses.  However, he did not contact his therapist after smoking marijuana in January, 2012, and was not truthful with his caseworker.

40.	The Court does not accept Father's testimony as truthful.

….

47.	In August, 2011, Mother told the [Court-Appointed Special Advocate] that she knew that she did not have a bond with S.B. and M.B.  She stated that she would be willing to give up her rights to S.B. and M.B., but wanted to keep her other three children.

48.	[The CASA] testified that it is in the best interests of S.B., C.B., and M.B. that parental rights be terminated.

Father's App. at 19-26.

Based upon these findings of fact and conclusions thereon, the trial court determined that:  (1) S.B. had been removed from Mother's and Father's care for at least six months under a dispositional decree; (2) there is a reasonable probability that the conditions that resulted in the removal of S.B. will not be remedied and/or the continuation of the parent-child relationship poses a threat to the well-being of S.B.; (3) termination of the parent-child relationship is in the best interests of S.B.; and, (4) DCS has a satisfactory plan for the care and treatment of S.B.  Accordingly, the trial court concluded that DCS had proven the allegations of the petition to terminate parental rights by clear and convincing evidence and

thereby terminated Mother's and Father's parental rights with respect to S.B. Both parents

now appeal.[3]

## Discussion and Decision

"The purpose of terminating parental rights is not to punish parents but to protect their

children. Although parental rights have a constitutional dimension, the law allows for their

termination when parties are unable or unwilling to meet their responsibility as parents." *In*

*re S.P.H.*, 806 N.E.2d 874, 880 (Ind. Ct. App. 2004) (citation omitted). Indeed, parental

interests "must be subordinated to the child's interests" in determining the proper disposition

of a petition to terminate parental rights. *In re G.Y.*, 904 N.E.2d 1257, 1260 (Ind. 2009).

Indiana Code Section 31-35-2-4(b) provides that a petition to terminate parental rights

must meet the following relevant requirements:[4]

(2) The petition must allege:

(A) that one (1) of the following is true:

> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

> (ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

> (iii) The child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-

---

[3] Although Mother and Father filed separate briefs, the arguments contained therein are virtually identical. Thus, we address their claims together.

[4] Indiana Code Section 31-35-2-4 was amended slightly in 2012. We refer to the version of the statute in effect at the time DCS filed its termination petition in 2011.

two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

DCS must prove "each and every element" by clear and convincing evidence. *G.Y.*, 904 N.E.2d at 1261; Ind. Code § 31-37-14-2. If the court finds that the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

We have long had a highly deferential standard of review in cases involving the termination of parental rights. *In re D.B.*, 942 N.E.2d 867, 871 (Ind. Ct. App. 2011). We neither reweigh the evidence nor assess witness credibility. *Id*. We consider only the evidence and reasonable inferences favorable to the trial court's judgment. *Id*. Where the trial court enters findings of fact and conclusions thereon, we apply a two-tiered standard of review: we first determine whether the evidence supports the findings and then determine whether the findings support the judgment. *Id*. In deference to the trial court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child

9

relationship only if it is clearly erroneous. *Id.* Clear error is that which "leaves us with a definite and firm conviction that a mistake has been made." *J.M. v. Marion Cnty. Office of Family & Children*, 802 N.E.2d 40, 44 (Ind. Ct. App. 2004), *trans. denied.*

Mother and Father challenge the trial court's conclusions that: (1) there is a reasonable probability that the conditions that resulted in S.B.'s placement outside the home will not be remedied;[5] (2) termination is in S.B.'s best interests; and, (3) DCS has a satisfactory plan for the care and treatment of S.B. We address each conclusion in turn.

### *Reasonable Probability that Conditions will not be Remedied*

First, with respect to the first challenged conclusion, this Court has said,

> When deciding whether there is a reasonable probability that the conditions leading to a child's removal will not be remedied, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing and take into consideration evidence of change conditions. Additionally, a court may consider not only the basis for a child's initial removal from the parent's care, but also any reasons for a child's continued placement away from the parent. The court may also consider the parent's habitual patterns of conduct, as well as evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. Additionally, the court may consider any services offered by the DCS to the parent and the parent's response to those services. Finally, we must be ever mindful that parental rights, while constitutionally protected, are not absolute and must be subordinated to the best interests of the child when evaluating the circumstances surrounding termination.

---

[5] Mother and Father also challenge the trial court's conclusion that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of S.B. Ind. Code §31-35-2-4(b)(2)(B)(ii). However, DCS is required to prove that there is a reasonable probability either that the conditions resulting in the child's placement outside the home will not be remedied, or that the continuation of the parent-child relationship poses a threat to the child's well-being. It need not prove both. *See In re W.B.*, 772 N.E.2d 522, 531 (Ind. Ct. App. 2002).

10

*In re D.K.*, 968 N.E.2d 792, 798 (Ind. Ct. App. 2012) (citations and quotation marks omitted).

Here, S.B has been twice removed from Mother and Father's home due to both parents' very serious drug abuse. The evidence supports a finding that, despite repeatedly receiving treatment for their substance abuse problems, both parents continue to use drugs. Since the dispositional hearing, both parents have routinely tested positive for controlled substances. When asked to participate in drug screens just in the two months preceding the hearing on the petition for termination of parental rights, each parent submitted to a screen only three times and failed to submit to a screen the other five times. Neither parent was truthful about his or her reason for missing the drug screens. The parents continue to minimize their drug use and appear to lack any insight as to how their drug use has negatively impacted their children and continues to prevent them from providing appropriate care for their children. The trial court concluded that based upon the parents' "habitual patterns of conduct, there is no reasonable probability that they will cease using controlled substances and provide a safe and stable home" for S.B. Father's App. at 28.

Mother and Father each point to their respective self-serving testimony regarding the strides they have made in dealing with their addictions. While it is true that the evidence indicates that Mother and Father have participated in drug treatment programs and have, at times, appeared to make some progress in their drug rehabilitation efforts, that progress has been minimal and they have both continued to use and repeatedly test positive for controlled substances. Based upon Mother's and Father's demonstrated inability to cease using

11

controlled substances and provide a safe and stable home for S.B., the trial court did not err in concluding that there was a reasonable probability that the conditions leading to S.B.'s removal will not be remedied. Both Mother's and Father's arguments to the contrary are invitations for us to reweigh the evidence, which we cannot do. *See D.B.*, 942 N.E.2d at 871.

### *Termination in S.B.'s Best Interests*

Regarding the best interests of S.B., as noted by the trial court, she has spent almost half of her young life in the care of family friends or in a foster home. She spent the first twenty-six months of her life living with the Heerdinks because her parents were not prepared to address her medical needs caused by her serious heart problem. Thereafter, although living with her parents over the next several years, she continued to spend a significant amount of time with the Heerdinks as a result of her parents' inadequacies before being removed from her parents care in May of 2009 due to their drug abuse. Then, after being returned to her parents' home in December 2009, she was removed again less than one year later due to their continued drug abuse and irresponsible behavior. At the time of the dispositional hearing, she had been in foster care for the last eighteen months and is apparently thriving. The CASA testified that termination of both Mother's and Father's parental rights was in S.B.'s best interests.

Mother's and Father's sole argument in this regard is essentially that, notwithstanding their separation from S.B. for a large part of her young life, they wish to engage in reunification efforts and try to bond with S.B. However, Mother and Father continue to downplay the effect that their continued drug use has on S.B.'s well-being. As recognized by

12

the trial court, permanence and stability, two things that Mother and Father have been unable and/or unwilling to provide due to their drug use, are in S.B.'s best interests. Again, Mother and Father merely invite us to reweigh the evidence, a task not within our prerogative on appeal.

### *DCS has a Satisfactory Plan for the Care and Treatment of S.B.*

Finally, Mother and Father assert that the trial court erred when it concluded that DCS has a satisfactory plan for the care and treatment of S.B. In order for the trial court to terminate the parent-child relationship, the trial court must find that there is a satisfactory plan for the care and treatment of the child. Ind. Code § 31-35-2-4(b)(2)(D). "This plan need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated." *In re B.D.J.*, 728 N.E.2d 195, 204 (Ind. Ct. App. 2000).

DCS presented evidence that its plan for the care and treatment of S.B. is adoption. The record indicates that she has formed a strong bond over the last three years with her foster parents, Raymond and Veda Davis, and they wish to adopt her. The Heerdinks also wish to adopt S.B. As concluded by the trial court, either family can provide a safe and stable home for S.B. Although Mother and Father concede that DCS clearly demonstrated that adoption is the plan for S.B., they nonetheless argue that we should find that plan unsatisfactory because it may possibly cause S.B. to be separated from some or all of her siblings. Mother and Father cite no authority, and we are unaware of any, to support their contention that such separation would render an adoption plan unsatisfactory. Again, the

crux of their argument demonstrates a lack of awareness of the consequences of their continued drug abuse, and this is yet another invitation for us to reweigh the evidence in their favor. We decline their invitation. There is clear and convincing evidence in the record to support the trial court's conclusion that DCS has a satisfactory plan for S.B.'s care and treatment.

In sum, the trial court's termination of Mother's and Father's parental rights to S.B. was not clearly erroneous based upon the record before us. We therefore affirm the trial court's judgment.

Affirmed.

ROBB, C.J., and FRIEDLANDER, J., concur.