## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Apr 14 2016, 9:14 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Andrew J. Sickmann
Boston Bever Klinge Cross & Chidester
Richmond, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of K.M. (Minor Child) and T.M. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

April 14, 2016

Court of Appeals Case No. 89A05-1510-JT-1680

Appeal from the Wayne Superior Court

The Honorable Darrin M. Dolehanty, Judge

Trial Court Cause No. 89D03-1504-JT-13

**Mathias, Judge.**

[1] T.M. ("Mother") appeals the involuntary termination of her parental rights to her minor daughter ("Child"). Mother presents one issue, which we restate as whether the evidence was sufficient to support the trial court's termination order.

[2] We affirm.

## Facts and Procedural History

[3] Child was born on July 11, 2005, to Mother and C.M. ("Father").[1] In April 2013, Mother went to Michigan in the middle of the night and left seven-year-old Child home alone. At some point in the night, Child woke up and called 911 when she discovered that Mother was gone. Child was placed with Father on April 14, 2013, but the next day, Father notified the Department of Child Services ("DCS") that he was unable to keep her. Child was then placed in foster care.

[4] DCS filed a petition on April 16, 2013, alleging that Child was a Child in Need of Services ("CHINS"). A hearing was held that same day, and both parents admitted to the allegations in the CHINS petition that Child was left alone in the middle of the night when Mother traveled to Michigan. Shortly after,

---

[1] Father does not join in this appeal. Father was notified of the termination hearings but failed to attend. Accordingly, Father's parental rights to Child were also terminated.

Mother pleaded guilty to neglect of a dependent and served one year in the Department of Correction ("DOC").

[5] While Mother was incarcerated, the trial court held a review hearing on October 18, 2013, and a review and permanency plan hearing on April 7, 2014. The court determined that because Mother was incarcerated, she was unable engage in services and noted that reunification was dependent on "mother's participation in and success with services. . ." Appellant's App. p. 101. As a result, the court changed Child's permanency plan to a "concurrent plan. . . .[of reunification and] termination of parental rights and adoption." *Id.* at 104. In its April 8, 2014 permanency order, the court ordered Mother, after she was released from the DOC, to attend counseling and parenting instruction and maintain housing and employment. *Id.*

[6] After the April 2013 incident, Child developed a variety of special needs, including severe anxiety and depression from being abandoned by Father and from worrying that Mother would leave her as well. Child worried so much about whether Mother would not call or show up for visits that she would become physically ill and shred her clothing. Additionally, she had trouble sleeping and was easily irritated and angered. During the year that Mother was incarcerated, these behaviors disappeared. However, when Mother was released and a visitation plan was implemented, the behaviors returned.

[7] Child's foster father, Kurt Borntrager ("Borntrager"), and Child's therapist, Kari Yeardley ("Yeardley"), emphasized that Child struggles emotionally with

any kind of inconsistency. Tr. pp. 24, 42. Further, Child's Court Appointed Special Advocate ("CASA"), Christine Robinson, who has been involved in Child's life since 2013, expressed Child's need for stability, safety, and a special emphasis on structure. Tr. p. 48. Child's CASA stated that in her opinion, Mother could not provide Child with the stability, safety and structure that she needs. *Id.*

[8] Mother was released from the Department of Correction in May 2014, and the trial court signed an order on June 2, 2014, which stated that Mother was not complying with the dispositional order and that she had not seen Child in about one month. Appellant's App. p. 105. However, on November 19, 2014, the trial court entered another order, finding that Mother was engaged in services, employed, and recently had found housing. *Id.* at 106-07. At that point, the permanency plan was still reunification with Mother.

[9] Mother followed the court's order by participating in supervised visits with Child two to three days per week and calling Child in the evenings. She also participated in therapy but often missed appointments. Mother had no transportation of her own, so she relied on a family consultant through Lifeline Family Services to facilitate visitation with Child. In April 2015, these services stopped because Mother missed at least two appointments or visits.

[10] Furthermore, Mother struggled with maintaining consistent housing and employment. After being released from incarceration, Mother stayed with a friend in Greencastle, Indiana. Then, beginning in June 2014, she lived with

another friend for a couple of months in Richmond, Indiana. Mother then moved into a women's shelter in Richmond in August 2014 until she moved to an apartment in Richmond in October 2014. Mother was evicted from that apartment in February 2015 and stayed with a friend for a few weeks until she moved to another apartment in Richmond. In March 2015, Mother became homeless and stayed at a shelter in Muncie, Indiana, until June 2015, when she moved into another apartment in Richmond.

[11] Mother worked at a fast food restaurant after being released from the DOC until November 2014, then worked at a motel as a housekeeper for a couple of months. She was employed at a gas station on the first day of the termination hearing on July 7, 2015, but was no longer employed at the time of the second hearing on July 29, 2015.

[12] Although Mother had taken steps to comply with the court's dispositional order, on April 16, 2015, the trial court in its permanency plan order found that: (1) Mother "inconsistently complies with the child's case plan"; (2) Mother is "not currently employed"; (3) Mother has "no income"; (4) Mother was homeless for a period of time in February-March 2015 following an eviction; (5) Mother currently has rented an apartment for two months with student loan money; and (6) the CASA recommends that the permanency plan be changed to termination of parental rights and adoption by the foster family. *Id.* at 110-11.

[13] On April 22, 2015, after the court changed the permanency plan to termination and adoption, DCS filed a new petition to terminate Mother's parental rights, which was later amended on May 11, 2015. The trial court held an evidentiary hearing on the termination petition on July 7 and 29, 2015 and took the matter under advisement.[2] On July 31, 2015, the trial court entered an order terminating Mother's parental rights.[3] Mother now appeals.

## Standard of Review

[14] We have long had a highly deferential standard of review in cases involving the termination of parental rights. *In re D.B.*, 942 N.E.2d 867, 871 (Ind. Ct. App. 2011). We neither reweigh the evidence nor assess witness credibility. *Id.* We consider only the evidence and reasonable inferences favorable to the trial court's judgment. *Id.* Where the trial court enters findings of fact and conclusions thereon, we apply a two-tiered standard of review: we first determine whether the evidence supports the findings and then determine whether the findings support the judgment. *Id.* In deference to the trial court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous. *Id.* Clear error is that which "leaves us with a definite and firm conviction that a mistake has been

---

[2] The second evidentiary hearing was held so that a witness who could not be present at the July 7, 2015 hearing could testify.

[3] As noted above, Father's parental rights were also terminated to Child in this proceeding, but he does not contest the trial court's determination.

made." *J.M. v. Marion Cnty. Office of Family & Children*, 802 N.E.2d 40, 44 (Ind. Ct. App. 2004), *trans. denied*.

## Termination of Parental Rights

[15] "The purpose of terminating parental rights is not to punish parents but to protect their children. Although parental rights have a constitutional dimension, the law allows for their termination when parties are unable or unwilling to meet their responsibility as parents." *In re S.P.H.*, 806 N.E.2d 874, 880 (Ind. Ct. App. 2004) (citation omitted). Indeed, parental interests must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights. *In re G.Y.*, 904 N.E.2d 1257, 1259 (Ind. 2009).

[16] Indiana Code section 31-35-2-4(b) provides that a petition to terminate parental rights must meet the following requirements:

> (2) The petition must allege:
>
> (B) that one (1) of the following is true:
>
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and

> (D) that there is a satisfactory plan for the care and treatment of
> the child.

[17] However, Indiana Code section 4(b)(2)(B) is written in the disjunctive; therefore, the trial court is required to find that only one prong of subsection (2)(B) has been established by clear and convincing evidence. *In re A.K.,* 924 N.E.3d 212, 220 (Ind. Ct. App. 2010). DCS must prove "each and every element" by clear and convincing evidence. *G.Y.*, 904 N.E.2d at 1261; Ind. Code § 31-37-14-2. Clear and convincing evidence need not establish that the continued custody of the parent is wholly inadequate for the child's very survival. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). Rather, it is sufficient to show by clear and convincing evidence that the child's emotional development and physical development are put at risk by the parent's custody. *Id.* If the court finds the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

## I. Conditions that Led to Removal

[18] Mother argues that DCS did not present sufficient evidence to support the trial court's determination that a reasonable probability exists that conditions which led to Child's placement outside of Mother's home would not be remedied. Specifically, Mother contends that the reason Child was removed was because Child was left without supervision, not that Mother did not maintain adequate shelter or consistently hold a job.

[19] When making a determination as to whether a reasonable probability exists that the conditions resulting in a child's removal or continued placement outside of a parent's care will not be remedied, the trial court must judge a parent's fitness to care for her child at the time of the termination hearing while also taking into consideration evidence of changed circumstances. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156-57 (Ind. Ct. App. 2013). The trial court is also required to consider the parent's habitual patterns of conduct in order to determine the probability of future neglect or deprivation of the child. *Id.* at 1157. The trial court may consider evidence of a parent's prior history of neglect, failure to provide support, and lack of adequate housing and employment. *Id.* The trial court may consider the services offered to the parent by DCS and the parent's response to those services as evidence of whether conditions will be remedied. *Id.* DCS is not required to provide evidence ruling out all possibilities of change. *Id.* Instead, it needs to establish only that a "reasonable probability" exists that the parent's behavior will not change. *Id.*

[20] Here, the CHINS proceeding was initiated because Mother left Child home alone when she traveled to Michigan in the middle of the night. In its order, the trial court authorized the removal of Child from Mother's home due to "an inability, refusal or neglect to provide shelter care and/or supervision at the present time." Appellant's App. p. 43.

[21] DCS presented evidence that Mother has been unable to maintain stable housing and employment after being released from the DOC. Specifically, Mother has lived between five and six different places since being released from

prison and has had several jobs. She has also been evicted from numerous apartments because she could not afford the rent and was homeless for a period of time. On the date of the last termination hearing, Mother was again unemployed. Further, Mother's therapist, Elaine Marsh ("Marsh"), who had worked with her for about one year, noted that Mother has a "history of psychiatric instability" and that she is emotionally and socially underdeveloped for a thirty-four-year old woman. Appellant's App. p. 113. Marsh also expressed that Mother can only be "an effective and safe parent" if she "is psychiatrically and behaviorally safe." *Id.* However, in the past year, Mother has "done little to take responsibility for her own actions." *Id.* at 115. Marsh concluded that Mother's progress in therapy became stagnant.

[22] Based on these facts and circumstances, the trial court did not clearly err when it concluded that the conditions that led to Child's removal from Mother's home would not be remedied. It is within the trial court's discretion to consider evidence of a parent's prior history of neglect, failure to provide support, and lack of adequate housing and employment when determining if the conditions that led to removal were remedied. *See A.D.S.,* 987 N.E.2d at 1157. Accordingly, Mother's argument is simply a request to reweigh the evidence, which is not within our role as an appellate court.

## II. Continuation of Parent-Child Relationship

[23] Mother also argues that the trial court did not conclude in its termination order that Mother was a threat to the well-being of Child, but rather that DCS has

implied such a finding. However, because as noted above, Section 4(b)(2)(B) is written in the disjunctive, the trial court need only determine that one prong of this subsection has been established by clear and convincing evidence. *In re A.K*, 924 N.E.2d at 220. The trial court properly found that a reasonable probability exists that the conditions which led to Child's removal from Mother's home would not be remedied. Therefore, we need not address Mother's argument involving the continuation of the parent-child relationship regardless of whether DCS made such an implication.

### III. Best Interests of the Child

[24] Mother further challenges the trial court's determination that termination of her parental rights was in the best interests of Child. When determining what is in the best interests of a child, the trial court must look beyond the factors identified by DCS and look to the totality of the evidence. *A.D.S.*, 987 N.E.2d at 1158. In doing so, the court must subordinate the interests of the parent to those of the child. *Id.* The court need not wait until the child is irreversibly harmed before terminating the parent-child relationship. *Id.* A recommendation by the case manager or child advocate to terminate parental rights is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *Id.* at 1158-59. Permanency is a central concern in determining the best interests of a child. *Id.* at 1159.

[25] Child was left alone in the middle of the night when Mother traveled to Michigan while she was under Mother's care. Further, after being released from

the DOC, Mother has been unable to maintain stable employment and housing that Child needs. Mother is also incapable of providing Child with the emotional stability that she requires. Both foster father Borntrager and therapist Yeardley emphasized Child's need for stability in her life.

[26] Without stability and structure, Child suffers from severe anxiety and depression, which causes her to become physically ill and shred her clothing. Borntrager testified that Child did much better when Mother was incarcerated and Child did not worry about whether Mother would show up for visits or call as promised. Borntrager and his wife have provided Child with structure and stability since she was placed in their home in October 2013 and are willing to adopt Child.

[27] Further, the DCS case manager testified that in her opinion, termination of Mother's parental rights was in Child's best interests. Child's CASA also testified that she believes Mother loves Child, but Mother is not able to provide the safety, stability, and structure that Child needs. Therefore, we cannot conclude that the trial court clearly erred when it determined that termination of Mother's parental rights to Child was in the best interests of Child.

## Conclusion

[28] This is a heartbreaking situation. Mother and Child love each other and appear to be bonded. Even though Mother participated in DCS-provided services and regularly visited Child, she has been consistently unable to maintain stable employment and housing. She had held numerous jobs for short periods of time

and has lived in at least five or six different places since she was released from the Department of Correction in 2014. Mother also was homeless for a period of time in 2015 and unemployed on the last day of the termination hearing. The record is clear that Child desperately needs emotional stability and structure that Mother has been unable to provide Child since 2013. Applying our highly deferential standard of review, we cannot conclude that the trial court's decision to terminate Mother's parental rights to to Child was clearly erroneous.

[29] Affirmed.

Vaidik, C.J., and Barnes, J., concur.