## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 06 2020, 11:39 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Steven Knecht
Vonderheide & Knecht, P.C.
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Natalie F. Weiss
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In re the Termination of the Parent-Child Relationship of A.C., J.S., and D.P. (Minor Children) and<br><br>A.S. (Mother),<br>*Appellant-Respondent,*<br><br>v.<br><br>Indiana Department of Child Services,<br>*Appellee-Petitioner.* | April 6, 2020<br><br>Court of Appeals Case No. 19A-JT-2592<br><br>Appeal from the Tippecanoe Superior Court<br><br>The Honorable Faith A. Graham, Judge<br><br>Trial Court Cause Nos.<br>79D03-1902-JT-34<br>79D03-1905-JT-61<br>79D03-1905-JT-81 |

**Mathias, Judge.**

A.S. ("Mother") appeals the order of the Tippecanoe Superior Court terminating her parental rights to her minor children A.C., J.S., and D.P. (collectively "the Children"). Mother presents one issue for our review: whether the Indiana Department of Child Services ("DCS") presented sufficient evidence to establish that termination of Mother's parental rights was in the best interests of the Children.

We affirm.

## Facts and Procedural History

Mother is the biological mother of A.C., born in March 2012; J.S., born in March 2016, and D.P., born in January 2018.[1] When D.P. was born at thirty-eight weeks of gestation, he weighed six pounds, seven ounces. Hospital staff were concerned about Mother's parenting because neither she nor D.P.'s father was caring for the infant at the hospital; Mother would not even get out of bed to care for herself. Hospital staff had to consistently remind Mother to feed D.P., who was crying, hungry, and in clothes saturated with urine. When Mother and D.P. were discharged on January 7, 2018, he weighed six pounds and .19 ounce. Hospital staff were concerned that the car seat Mother had for D.P. was too small and that she did not have sufficient clothing for the infant for the cold weather.

---

[1] M.S. is the alleged biological father of A.C.; T.G. is the biological father of J.S.; and D.P., Sr. is the father of D.P. None of the fathers are active participants in this appeal, but D.P., Sr. was a party below.

[4] On February 4, 2018, DCS received a report that D.P. was malnourished. At a follow-up medical appointment on February 14, 2018, D.P. weighed six pounds and .14 ounces. The doctor told Mother to take D.P. to the hospital emergency room immediately, but Mother did not go until over four hours later, claiming that the other children were sleeping and she did not want to wake them. When Mother arrived at the emergency room, D.P.'s condition was dire. His heart rate was very low. He remained curled up and did not wake up or cry. He appeared very malnourished and had skin flaps due to lack of body fat. D.P. was diagnosed with failure to thrive and admitted to the hospital.

[5] Mother's behavior at the hospital was concerning. She was not worried about D.P. but was angry with hospital staff. She was unable to say when she had last fed the infant. She had no plans for the care of A.C. or J.S., who were not allowed to stay at the hospital due to restrictions to limit the spread of influenza. Mother threatened to remove D.P. from the hospital and take A.C. and J.S. to Illinois where DCS would be unable to locate them.

[6] At the hospital, D.P.'s condition improved. He was given regular feedings and gained fourteen ounces in six days. By February 20, D.P. weighed seven pounds and could be discharged safely from the hospital. However, Mother still struggled with maintaining a feeding schedule and giving D.P. the proper amount of food. Nursing staff had to assist Mother while she fed the child.

[7] Mother informed DCS that her children had no beds and slept on the floor but claimed that she was working with a local organization to obtain beds. She also

stated that five-year-old A.C. had threatened to kill her infant sibling D.P. In turn, A.C. reported that she had not eaten that day, and that her parents locked her in her room as punishment. She also had bruises on her arms, and medical records revealed that Mother and D.P.'s father had struck A.C. on her arms during an obstetrician appointment when Mother was pregnant with D.P. Both A.C. and J.S. had head lice, and J.S. had severe diaper rash.

[8] Because Mother continued to demonstrate an inability to care for the Children, DCS decided to remove the Children from Mother's care. On February 20, DCS placed the Children in protective custody and two days later filed a petition alleging that the Children were children in need of services ("CHINS"). The trial court found the Children to be CHINS on May 31 and entered a dispositional decree the same day. Pursuant to the dispositional decree, Mother was required to inter alia: attend all court hearings, conferences, visitations, and appointments; contact DCS regularly; obtain and maintain safe and suitable housing; promptly enroll in all referred services; follow the recommendations of all assessments and evaluations; and find and maintain a legal and stable source of income.

[9] Unfortunately, Mother's participation in services was sporadic. She completed a mental health evaluation, a parenting evaluation, and a substance abuse assessment in spring 2018. However, she failed to complete a psychological examination. She was also discharged from therapy for failure to attend. Mother was referred to multiple agencies for case management services. Mother was uncooperative with case management providers and refused to give them

the information they requested and was dishonest with them. She was ultimately discharged for failure to attend scheduled case management sessions. In December 2018, the trial court found Mother in contempt in part for her failure to attend case management sessions. But even after being found in contempt, she attended only two of four scheduled sessions.

[10] Mother also failed to maintain employment. She was employed with two different employers for only five days. She was hired by another employer but failed to show up. She did occasionally sell her blood plasma to generate income. Additionally, Mother struggled to maintain adequate housing. She was evicted from her home in November 15, 2018, and lived in a tent in December 2018. She also stayed in a hotel temporarily. "Seeds of Hope," a community program, offered Mother housing assistance. Mother moved into the program's housing but left after a few days and again lived in a tent. In late January 2019, after her tent flooded, Mother returned to the Seeds of Hope housing. Seeds of Hope also provided Mother with life-skills training. Mother had difficulty creating a budget because she was vague about her income. Even when she needed groceries, Mother refused to use a food pantry. At the time of the termination hearing, Mother and D.P.'s father were living in a two-bedroom apartment provided by Seeds of Hope.

[11] DCS referred Mother to several different agencies to facilitate supervised parenting time. Mother failed to regularly attend scheduled visitation and was eventually discharged by seven facilitators for failure to attend and follow policies. The trial court found Mother in contempt of court in part in December

2018 for failure to attend visitations. Because Mother's failure to attend caused the children distress, the trial court suspended Mother's visitations.

[12] The Children were placed with the same pre-adoptive foster family in May 2018, and all are doing well in foster care.

[13] On March 7, 2019, DCS filed petitions to terminate Mother's parental rights to the Children. The trial court held evidentiary hearings on the petitions on June 11, 2019. On October 9, 2019, the trial court entered findings of fact and conclusions of law terminating Mother's parental rights. Mother now appeals.

## Termination Statute

[14] Indiana Code section 31-35-2-4(b)(2) provides that a petition to terminate parental rights must allege:

> (B)  that one (1) of the following is true:
>
> > (i)   There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> >
> > (ii)  There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> >
> > (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C)  that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

DCS must prove each of these elements by clear and convincing evidence. Ind. Code § 31-37-14-2; *In re G.Y.*, 904 N.E.2d 1257, 1261 (Ind. 2009). Because section 4(b)(2)(B) is written in the disjunctive, the trial court is required to find that only one prong of subsection 4(b)(2)(B) has been established by clear and convincing evidence. *In re A.K.*, 924 N.E.2d 212, 220 (Ind. Ct. App. 2010).

[15] Clear and convincing evidence need not establish that the continued custody of the parent is wholly inadequate for the child's very survival. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 148 (Ind. 2005). It is instead sufficient to show by clear and convincing evidence that the child's emotional and physical development are put at risk by the parent's custody. *Id.* If the court finds the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

## Standard of Review

[16] We have long had a highly deferential standard of review in cases involving the termination of parental rights. *In re D.B.*, 942 N.E.2d 867, 871 (Ind. Ct. App. 2011). Thus, on appeal, we neither reweigh the evidence nor assess witness credibility. *Id.* We consider only the evidence and reasonable inferences favorable to the trial court's judgment. *Id.* In deference to the trial court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous. *Id.* Clear error is that which leaves us with a definite and firm conviction that a mistake has been

made. *J.M. v. Marion Cty. Office of Family & Children,* 802 N.E.2d 40, 44 (Ind. Ct. App. 2004), *trans. denied.*

[17]  We note that, here, Mother does not challenge any of the trial court's factual findings as being clearly erroneous. We therefore accept the trial court's findings as true and determine only whether these unchallenged findings are sufficient to support the judgment. *In re S.S.*, 120 N.E.3d 605, 610 (Ind. Ct. App. 2019) (citing *McMaster v. McMaster*, 681 N.E.2d 744, 747 (Ind. Ct. App. 1997); *In re A.M.*, 121 N.E.3d 556, 562 (Ind. Ct. App. 2019), *trans. denied*; *see also T.B. v. Ind. Dep't of Child Servs.*, 971 N.E.2d 104, 110 (Ind. Ct. App. 2012) (holding that when the trial court's unchallenged findings support termination, there is no error), *trans. denied*.

## Discussion and Decision

[18]  On appeal, Mother argues that DCS did not prove that termination of her parental rights was in the best interests of the Children. In determining what is in the best interests of a child, the trial court must look beyond the factors identified by DCS and look to the totality of the evidence. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1158 (Ind. Ct. App. 2013), *trans. denied*. In so doing, the trial court must subordinate the interests of the parent to those of the child and need not wait until the child is irreversibly harmed before terminating the parent-child relationship. *Id.* Moreover, a recommendation by a case manager or a child advocate to terminate parental rights is sufficient to show by

clear and convincing evidence that termination is in the child's best interests. *Id.* at 1158–59.

[19]  In the present case, both the court-appointed special advocate ("CASA") and the family case manager testified that termination of Mother's parental rights was in the best interests of the Children. Mother did not participate in recommended services after she completed the initial assessments. She failed to complete the psychological evaluation and was discharged from therapy for failure to attend. She was discharged from case management services for failure to attend. And, even after being found in contempt for her failure to participate, she attended only two of four sessions. Mother was unable to maintain steady employment or find another source of income. Although Mother appeared to be bonded with the Children, she failed to regularly attend scheduled visitation, and her failure to attend distressed the Children. She was discharged by all of the referred visitation facilitators for failure to attend and follow the applicable policies. Furthermore, Mother did not maintain regular contact with DCS. And, perhaps most disturbing, she never took responsibility for D.P.'s failure to thrive, instead blaming doctors and others. Lastly, the Children are all thriving in the same pre-adoptive foster home.

[20]  In short, Mother never demonstrated an ability to adequately care for herself, much less three young children. Thus, there was sufficient evidence that termination of Mother's parental rights was in the best interests of the Children.

# Conclusion

Considering only the evidence favoring the trial court's judgment, and the reasonable inferences to be drawn from this evidence, we hold that the trial court did not clearly err in concluding that DCS proved by clear and convincing evidence that termination of Mother's parental rights was in the best interests of the Children. We therefore affirm the judgment of the trial court.

Affirmed.

Riley, J., and Tavitas, J., concur.