Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.

**FILED**

*Kevin S. Smith*

**CLERK**
of the supreme court, court of appeals and tax court

ATTORNEY FOR APPELLANT A.B.:

**HEATHER M. SHUMAKER**
Kirtley, Taylor, Sims, Chadd & Minnette, P.C.
Lebanon, Indiana

ATTORNEY FOR APPELLANT M.B.:

**MARK SMALL**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
**DAVID E. COREY**
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: Bry.B. and B.B. (minor children) and | ) ) ) ) | |
| A.B. (Mother) and M.B. (Father), | ) ) | |
| Appellants-Respondents, | ) ) | |
| vs. | ) ) | No. 54A01-1310-JT-450 |
| INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) ) | |
| Appellee-Petitioner. | ) | |

APPEAL FROM THE MONTGOMERY CIRCUIT COURT
The Honorable Harry A. Siamas, Judge
Cause Nos. 54C01-1306-JT-127 and 54C01-1306-JT-128

**March 18, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**CRONE, Judge**

**Case Summary**

A.B. ("Mother") and M.B. ("Father") appeal the involuntary termination of their parental rights to their minor children, Bry.B. and B.B. We affirm.

**Facts and Procedural History**

In its termination order, dated October 7, 2013, the trial court made the following relevant findings of fact:[1]

> 1.     Mother and Father are the biological parents of B.B. who was born on June 18, 2010 and Bry.B. who was born on June 6, 2011.
>
> 2.     On November 9, 2011 the DCS removed both children from the home of their parents. On that date Mother, celebrating her release from jail, smoked marijuana while both children were in her care. Apparently believing her home was on fire she left the children alone while she went to call for help. Father was not present in the home when this occurred. The following day the DCS filed its petition with the court alleging that both children were children in need of services. The petition alleged that on November 9, 2010 Crawfordsville police found the children alone in the home while Mother was walking back from Circle K gas station. Mother seemed impaired. The police officer had concerns about the condition of the home including dog feces on the floor, a stove that had been left on for several hours, and general clutter and disarray. Mother tested positive for Amphetamine, [B]enzodiazepine and THC. The petition further alleged that Mother stated that she woke up in the middle of the night and found the house filled with smoke, she left the children in the house and walked across the street to use the phone at the gas station. She admitted she took several non-prescribed Xanax, more than her prescribed Tramadol and smoking marijuana. The petition further alleged that Mother admitted using drugs to deal with the stress of caring for the children. The petition further alleged that the children were treated at the hospital and the treating physician was concerned about the children's hygiene including B.B.'s feet were black and dirt[y], Bry.B.'s eyes were matted shut and it appeared that the children had not been bathed in several days.

---

[1] We note that the trial court order uses "DCS" to indicate the Montgomery County Department of Child Services and "CHINS" to indicate child in need of services. We also note that the trial court's order refers to the parties by their full names. We use "Father," "Mother," "Bry.B.," and "B.B." where appropriate.

3. On December 12, 2011 Mother and Father admitted the allegations contained in the CHINS petition, the Court adjudicated B.B. and Bry.B. to be CHINS and the parties agreed to proceed with disposition on the same date.

4. The Court's Dispositional Order returned the children to the home of their parents. The children were made wards of the DCS. The parents were ordered to maintain a safe, clean and age appropriate home; submit to random drug screens; provide appropriate supervision for the children at all times; participate in [various specific programs and services offered by DCS].

5. On December 22, 2011 Father was arrested and he remained in jail until January 6, 2012.

….

7. On March 26, 2012, the court conducted a detention hearing at the request of the DCS. The court entered a detention order that placed the children with the mother as long as she did not allow Father to have contact with the children. Father's visits with the children were ordered supervised by the DCS. Father was not allowed to live in the home with Mother and the children at the time.

8. On April 18, 2012 Father was arrested and he remained in jail until May 21, 2012.

9. On April 30, 2012 a review hearing was conducted. The Court found that the children continued to be CHINS. The Court found that the services provided by the DCS were reasonable and should continue. However, since Father was in jail the Court found that a team meeting should be held upon his discharge from jail in order to determine appropriate services for him. The children remained with Mother under the supervision of the DCS.

10. Mother was arrested on June 7, 2012, and she remained in jail until July 1, 2012.

11. On June 7, 2012, a Detention Hearing was held. Since Mother was in jail the children were placed with Father. The Court ordered that Mother could not live in the home with the children.

12. On August 10, 2012 the children were removed from Father's home. A Detention Hearing was held that date and the Court ordered that the children be removed from their parents' home; that Mother could have supervised visits and Father's visits would be arranged through the DCS. The children have been placed outside their parents' home continuously since August 10, 2012.

13. A permanency hearing was held on November 1, 2012. The Court ordered that the children remain in foster care and that both parents should continue to participate in the previously ordered services: individual therapy, couples therapy, substance abuse therapy, home based case management, drug screens, and visitation with the children arranged through the DCS. The court found the permanency plan should be reunification of the children with their parents.

14. On November 30, 2012 Father and Mother were arrested. Mother remained in jail until March 5, 2013. Father has not been released from confinement. On April 15, 2013 Father was convicted of two counts of forgery as class C felonies and sentenced to five years incarceration on each count to run concurrently with one another. Father was on probation at the time and the court revoked Father's thirty month sentence which runs consecutively to his sentences for forgery. Each sentence was executed to the Indiana Department of Corrections. Father's earliest release date from incarceration is August 14, 2016 although he hopes to earn credit time reductions that may allow him to be released as early as the end of 2014.

15. Father has not had contact with the children since November 30, 2012.

….

17. On October 2, 2013 the DCS' petition to terminate the parent-child relationship was heard.

….

19. From the beginning of the DCS' involvement with this family both parents resisted the DCS' attempt to offer appropriate services to address all issues that afflicted this family. Mother either would not or could not consistently participate in the services that the DCS offered. She did not attend or participate in counseling or case management services on a consistent basis. For the most part she refused substance abuse treatment. The result was

that she failed to make the connection between her substance abuse and the effect it has on her ability to be an appropriate parent for her children. She continues to abuse drugs even though she knows that her drug use prevents her from having her children returned to her. Her children were initially removed from her care on November 9, 2011 because she was under the influence and impaired from drug use to the extent that she left her children alone in a home that she thought was on fire. Yet despite the efforts of the DCS to offer her education and therapy to address her drug abuse she continued to use drugs. On June 7, 2012 Father returned home to find Mother had consumed drugs and had passed out in a pool of her own vomit. The children were in her care at the time. Mother was combative with Father and was arrested. She remained in jail until July 1, 2012. She tested positive for marijuana use on April 2, 2013, April 23, 2013, July 11, 2013 and July 15, 2013. Mother failed to use the services offered to her to address the other issues that plague her life. Her mental health is poor and a real hindrance to her ability to care for her children. She attempted suicide on September 18, 2012 when she overdosed on thyroid pills. She attempted suicide again on October 10, 2012 when she attempted to cut her wrists. Mother was scheduled for inpatient treatment during this time but she did not show up for admission and refused to participate. She has been unable to cope with the stress in her life and acts out inappropriately against Father by hitting him, self medicates herself with illegal substances, attempts suicide, refuses to cooperate with DCS and service providers. She continues to make poor choices in her life. In July 2013 she allowed [a sex offender] to move in with her. He paid the rent and utility bills for her. However, on July 24th he battered and victimized her. Mother has never had employment in her life. She has no means to support herself or her children. At the time of the hearing she relies on her mother to provide her the necessities of life. Mother has not taken advantage of opportunities to visit with her children when offered. She often has missed scheduled visits or cancelled visits with her children. For instance Mother was in jail from November 30, 2012 until her release on March 5, 2013 but she didn't bother to restart her visits with her children until May 7, 2013. After May 30, 2013 Mother was entitled to visit with the children once each week but the last visit she had was on July 18, 2013. At the time of the termination hearing she hadn't bothered to visit with her children for ten consecutive weeks.

20. Father resisted the services offered by DCS. He often became angry and threatening to the DCS. He was inconsistent in participating with the home based case management services and therefore failed to consistently work on his parenting skills, employment issues, child care issues, and appropriate housing for his family. Father was able to work but this added stress to his life because he struggled to find appropriate care for his children

5

while he was at work. He often refused direction or advice on how to best handle these issues. He refused to acknowledge that his children had scabies and head lice and he refused to give them their medication for this condition. Father allowed Mother to come into his home and care for the children when she was court-ordered not to be with the children unsupervised. Father was inconsistent in attending mental health counseling. He was supposed to attend counseling weekly but failed to do so. When the children were placed outside of his home Father was able to visit them at any time. However, Father never independently scheduled a time to visit the children. He sometimes would visit the children at the same time as Mother had supervised visits. Father was unable to maintain housing for himself or his children during the periods he was not incarcerated. He was evicted at least twice from residences. Finally, the delivery of services to Father was particularly difficult because he was arrested and jailed on three different occasions during the DCS' involvement with the family.

21.    B.B. and Bry.B. have been in foster care since August 10, 2012. When the children came to their therapeutic foster home on August 30, 2012 they had poor eating habits, poor sleep habits, poor bathing habits and they generally were difficult to manage. B.B. would bite Bry.B. B.B. physically abused himself; he would bite himself, pull his hair out and slap himself. Both children would bang their heads. B.B. was still in diapers. At the time of the termination hearing the children's behavior had greatly improved; their eating, bathing and sleeping habits are normal; they don't bang their heads and B.B. doesn't abuse himself or Bry.B. However, some of these behaviors recur after the children had visits with their parents; B.B. would wet himself, both the boys would cry and have trouble sleeping.

22.    The children's therapeutic foster parents are willing to adopt B.B. and Bry.B.

Mother's App. at 41-47.

Based upon these findings of fact, the trial court concluded that: (1) B.B. and Bry.B. have been removed from their parents' care for at least six months under a dispositional decree; (2) there is a reasonable probability that the conditions that resulted in the removal of the children and their continued placement outside the parents' home will not be remedied; (3) termination of the parent-child relationship between both parents and both children is in

6

the best interests of the children; and (4) DCS has a satisfactory plan for the care and treatment of the children, and such plan is adoption. Accordingly, the trial court determined that the DCS had proven the allegations of the petition to terminate parental rights by clear and convincing evidence and therefore terminated both Mother's and Father's parental rights. Mother and Father each appeal. Additional facts will be provided as necessary.

**Discussion and Decision**

"The purpose of terminating parental rights is not to punish parents but to protect their children. Although parental rights have a constitutional dimension, the law allows for their termination when parties are unable or unwilling to meet their responsibility as parents." *In re S.P.H.*, 806 N.E.2d 874, 880 (Ind. Ct. App. 2004) (citation omitted). Indeed, parental interests "must be subordinated to the child's interests" in determining the proper disposition of a petition to terminate parental rights. *In re G.Y.*, 904 N.E.2d 1257, 1260 (Ind. 2009).

Indiana Code Section 31-35-2-4(b) provides that a petition to terminate parental rights must meet the following relevant requirements:

(2) The petition must allege:

(A) that one (1) of the following is true:

> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
>
> (ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.
>
> (iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen

7

(15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

DCS must prove "each and every element" by clear and convincing evidence. *G.Y.*, 904 N.E.2d at 1261; Ind. Code § 31-37-14-2. If the court finds that the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

We have long had a highly deferential standard of review in cases involving the termination of parental rights. *In re D.B.*, 942 N.E.2d 867, 871 (Ind. Ct. App. 2011). We neither reweigh the evidence nor assess witness credibility. *Id*. We consider only the evidence and reasonable inferences favorable to the trial court's judgment. *Id*. Where the trial court enters findings of fact and conclusions thereon, we apply a two-tiered standard of review: we first determine whether the evidence supports the findings and then determine whether the findings support the judgment. *Id*. In deference to the trial court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child

8

relationship only if it is clearly erroneous. *Id.* Clear error is that which "leaves us with a definite and firm conviction that a mistake has been made." *J.M. v. Marion Cnty. Office of Family & Children*, 802 N.E.2d 40, 44 (Ind. Ct. App. 2004), *trans. denied.*

We note that Mother and Father filed separate briefs and make some similar and some different arguments. Mother and Father both challenge the trial court's conclusion that there is a reasonable probability that the conditions that resulted in the children's placement outside of the home will not be remedied.[2] Mother additionally challenges the trial court's conclusion that the children were removed from her care for at least six months pursuant to a dispositional decree as required by Indiana Code Section 31-35-2-4(b)(2)(A)(i). We will address these challenges in turn.

### Reasonable Probability that Conditions will not be Remedied

First, with respect to this conclusion, we have explained,

> When deciding whether there is a reasonable probability that the conditions leading to a child's removal will not be remedied, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing and take into consideration evidence of changed conditions. Additionally, a court may consider not only the basis for a child's initial removal from the parent's care, but also any reasons for a child's continued placement away from the parent. The court may also consider the parent's habitual patterns of conduct, as well as evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. Additionally, the court may

---

[2] Neither parent challenges the trial court's conclusion that termination of their parental rights is in the best interest of the children or the trial court's conclusion that DCS has a satisfactory plan for the children's care and treatment, so we will not address those conclusions. Moreover, because DCS is required to prove either that there is a reasonable probability that the conditions resulting in the children's placement outside of the home will not be remedied, *or* that the continuation of the parent-child relationship poses a threat to the children's well-being, we also need not address whether the continuation of the parent-child relationship poses a threat to B.B.'s and Bry.B.'s well-being. *See In re W.B.*, 772 N.E.2d 522, 531 (Ind. Ct. App. 2002).

9

consider any services offered by the DCS to the parent and the parent's response to those services. Finally, we must be ever mindful that parental rights, while constitutionally protected, are not absolute and must be subordinated to the best interests of the child when evaluating the circumstances surrounding termination.

*In re D.K.*, 968 N.E.2d 792, 798 (Ind. Ct. App. 2012) (citations and quotation marks omitted).

Here, the children were initially removed from the home after Mother, in a drug-impaired state, left the children alone in the home she believed was on fire. Concerns regarding both Mother's and Father's parenting and life skills became immediately apparent to authorities due to the general state of filth and disarray of the home as well as the children's extremely poor hygiene. Nevertheless, the children were returned to the home, and numerous services were offered to help Mother and Father. The record indicates that neither Mother nor Father has consistently cooperated with DCS or consistently participated in the services offered. Moreover, each parent was arrested and jailed at one time or another while the children were in their respective care. These circumstances led to such neglect that the children were removed from the home and placed in foster care. Since removal, neither parent has been able to remain drug-free, and each parent was again arrested and jailed. Indeed, Father is currently serving a prison sentence with a release date in 2016. The record is replete with evidence of both Mother's and Father's habitual patterns of poor decision making and, despite repeated opportunities, Mother and Father continue to fail to demonstrate that they are willing or able to provide for these children. Based upon Mother's and Father's inability to cease using controlled substances, to lead law-abiding lives, to

address their chronic dysfunction, and to provide a clean, safe, and stable home for Bry.B. and B.B., we cannot say that the trial court clearly erred in concluding that there was a reasonable probability that the conditions leading to the children's removal will not be remedied. [3] Both Mother's and Father's arguments to the contrary are invitations for us to reweigh the evidence, which we cannot do. *See D.B.*, 942 N.E.2d at 871.

**Children's Removal for Requisite Time Period**

Mother additionally challenges the trial court's conclusion that the children were removed from her care for at least six months pursuant to a dispositional decree as required by Indiana Code Section 31-35-2-4(b)(2)(A)(i). An involuntary termination petition must allege, and the State must prove by clear and convincing evidence, that the child was removed from the parent for at least six months under a dispositional decree at the time the involuntary termination is filed. *Platz v. Elkhart Cnty. Dep't of Pub. Welfare*, 631 N.E.2d 16, 18 (Ind. Ct. App. 1994). Mother does not dispute that children had been removed from her care and had been continuously placed in foster care for at least six months prior to the filing of the termination petition. Nevertheless, Mother argues that the original December 14, 2011 dispositional order, which placed the children in Mother's and Father's care, was never officially modified to remove the children. Thus, she argues, although the children had been

---

[3] Father points out that it was Mother's "neglect" that caused DCS to become involved with the family and that he was not present when Mother left the children alone in the home she thought was on fire. Father's Br. at 13. While this event may indeed have been the catalyst for DCS involvement and the children's initial removal from the home, Father may not escape responsibility, as his failure to address his own habitual patterns of conduct contributed significantly to the children's subsequent and continued removal from the home.

11

removed from her care for over six months, such removal was not pursuant to a dispositional decree. We are not persuaded by Mother's arguments.

We have explained that for purposes of the element of the involuntary termination statute requiring a child to have been removed from the parent for at least six months under a dispositional decree before termination may occur, such a dispositional decree "is one that authorizes an out-of-home placement." *In re D.D.*, 962 N.E.2d 70, 75 (Ind. Ct. App. 2011) (citation and some quotation marks omitted). Indeed, as we noted in *D.D.,* our supreme court has explained that in certain circumstances, it would be unrealistic to say that children were not removed from a parent's custody by a dispositional hearing or decree merely because the court did not expressly say so in its order removing the children. *Id*. (citing *In re Robinson v. Madison Cnty. Dep't of Pub. Welfare*, 538 N.E.2d 1385, 1387 (Ind. 1989)). Here, a final detention hearing was held on August 10, 2012, after which the trial court entered its order removing the children from the home and placing the children in foster care. Regardless of whether the trial court called its hearing a detention or dispositional hearing and regardless of what the trial court called its order, the result is the same. The trial court entered a decree authorizing the children's out-of-home placement in foster care and, at the time the petition for involuntary termination of parental rights was filed, the children had been removed from Mother's care pursuant to that decree for more than six months. Mother's challenge to the trial court's conclusion that the children were removed from her care for at least six months pursuant to a dispositional decree is unavailing.

**Conclusion**

In sum, the trial court did not clearly err in concluding that there was a reasonable probability that the conditions leading to the children's removal will not be remedied. Moreover, the trial court did not clearly err in concluding that the children had been removed from Mother's care for at least six months pursuant to a dispositional decree. We affirm the trial court's decision to terminate both Mother's and Father's parental rights to Bry.B. and B.B.

Affirmed.

BAKER, J., and NAJAM, J., concur.