# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.

| ATTORNEY FOR APPELLANT | ATTORNEYS FOR APPELLEE |
| --- | --- |
| Valerie K. Boots | Gregory F. Zoeller |
| Marion County Public Defender Agency | Attorney General of Indiana |
| Indianapolis, Indiana | |
| | Robert J. Henke |
| | Abigail R. Recker |
| | Deputy Attorneys General |
| | Indianapolis, Indiana |



FILED
Jun 25 2015, 10:32 am
CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
| --- | --- |
| In the Matter of the Termination of the Parent-Child Relationship of: L.G. (Minor Child) and | June 25, 2015 |
| | Court of Appeals Case No. 49A02-1412-JT-841 |
| D.G. (Father), | Appeal from the Marion Superior Court |
| *Appellant-Respondent,* | |
| v. | The Honorable Gary K. Chavers, Judge Pro Tem |
| Indiana Department of Child Services, | The Honorable Larry E. Bradley, Magistrate |
| *Appellee-Petitioner,* | Case No. 49D09-1406-JT-266 |
| and | |

Child Advocates, Inc.,

*Guardian ad Litem*

**Crone, Judge.**

# Case Summary

[1]    D.G. ("Father") appeals the involuntary termination of his parental rights to his minor child L.G.  We affirm.

# Facts and Procedural History

[2]    In July of 2012, K.P. ("Mother") was pregnant and living with Father and her two minor children from a different father, when she overdosed on Klonopin, Tramadol, and Flexeril.  Two months later, she gave birth to L.G.  L.G.'s meconium was screened following birth and tested positive for marijuana and hydrocodone.  Consequently, a report was forwarded to the Indiana Department of Child Services ("DCS").  Mother and Father signed an informal adjustment agreement with DCS that was approved by the trial court on October 22, 2012.  In that agreement, Mother and Father agreed to complete homebased counseling, random drug screens, and substance use assessments.  In February and March 2013, Mother and Father appeared before the trial court due to lack of progress with services and their repeated failures to report for random drug screens.  During this period, Father tested positive for THC on more than one occasion.  Following a review hearing, the trial court

admonished both parents that they needed to comply with services. Thereafter, Mother and Father continued to cancel appointments and failed to complete services. In April 2013, Mother tested positive for numerous substances and, during a meeting with their DCS family case manager ("FCM"), the FCM noted that Mother had a black eye. Father informed the FCM that the family home was being condemned by the health department, their car was being repossessed, and they had very little financial resources.

[3]     DCS filed a petition alleging that all three children living in the home were children in need of services ("CHINS"). That petition stated,[1]

> On or about April 12, 2013 the [DCS] determined, by its [FCM] Leslie Page, the children to be in need of services because their mother, Mother and Father, father of L.G., have failed to provide the children with a safe and appropriate living environment free from substance abuse. The parents have been involved with the DCS through an Informal Adjustment Agreement (IA) due to [L.G.] being born drug exposed. However, services have not successfully been completed to remedy the reasons for the DCS' involvement. Father has continued to test positive for marijuana during the IA, and the parents failed to report for all their drug screens resulting in their unsuccessful discharge from this service. In addition, Mother recently tested positive for marijuana, cocaine, opiates, and benzodiazepines. Mother and Father are also in danger of losing their housing, and they have failed to take necessary action to adequately address the above-mentioned issues despite services offered. Therefore, the coercive intervention of the Court is necessary to ensure the children's safety and well being.

---

[1] We note that the petitions filed with the trial court and the trial court's resultant orders refer to the parties by their full names. We use "Father," "Mother," and the initials of any minor children where appropriate.

Appellant's App. at 22. An initial hearing was held that same day and the trial court ordered all three children removed from the home. Regarding L.G., Mother admitted to the allegations in the petition that L.G. was born drug positive, that services were not completed, that her substance abuse issues needed to be addressed, and that coercive intervention of the court was necessary to ensure L.G.'s safety. Father waived his right to a factfinding hearing. On May 7, 2013, the trial court adjudicated L.G. a CHINS. The trial court entered a dispositional order requiring the parents to participate in homebased counseling, random drug and alcohol screens, and all scheduled visits with L.G.

[4] After more than a year of both parents failing to consistently complete ordered services, DCS filed a petition to terminate their parental rights to L.G. Following an evidentiary hearing, the trial court entered its findings of fact and conclusions thereon in relevant part as follows:

> 1. Father is the father of L.G., a minor child born on September 18, 2012.
>
> 2. Mother is the mother of L.G. She has executed consents for L.G. to be adopted.
>
> ….
>
> 9. Disposition was held on June 4, 2013, at which time L.G.'s placement continued outside the home. She had been removed for at least six (6) months prior to this termination action being filed on June 2, 2014.
>
> 10. Services were ordered and referred to address issues of substance abuse, anger after domestic violence episode, and identify any other areas of concern.

11. Father was unsuccessful in completing any of the services. He blamed lack of transportation but was provided two months of bus passes during the case.

12. Prior to random urine screens being closed, Father missed screens and tested positive for marijuana.

13. Father inconsistently attended C[H]INS hearings. He blamed his non-attendance on no one informing him of hearings, although he was present when some hearings were set, had an attorney until June of 2014, and at times was in touch with L.G.'s mother.

14. [] [T]he C[H]INS court changed L.G.'s plan of permanency from reunification to adoption finding, in part, that there had been no recent contact with Father, he had not participated in services for the last few months, had not been participating in home based therapy, and was unsuccessfully discharged from substance abuse treatment.

15. Father failed to appear at the Permanency Hearing.

16. Father has not visited L.G. since February of 2014, although the visit referral remained open until the May 27, 2014 Permanency Hearing.

17. There is a reasonable probability that the conditions that resulted in L.G.'s removal and continued placement outside the home will not be remedied by her father. Father failed to actively participate in services during the Informal Adjustment and C[H]INS cases to the extent needed to demonstrate that he is willing or able to do what was needed to be an appropriate parent. His lack of interest is also demonstrated in his inconsistent visits with L.G. and his lack of attendance at court hearings and Child and Family Team Meetings.

18. Continuation of the parent-child relationship poses a threat to L.G.'s well-being in that it would pose a barrier to obtaining permanency for her through adoption when her father has not made the effort needed to put him in a position to offer permanency. Without adequately addressing conditions, Father cannot provide L.G. with a safe environment. It is unclear whether he could provide a stable home to meet L.G.'s basic needs as he does not support his other children and cannot afford bus tickets.

19. L.G. has been placed in kinship care since her removal in April of 2013. She is placed with her two half-siblings and the placement is pre-adoptive. L.G. is bonded with her caregiver with whom she has

spent a majority of her life, and responds to her caregiver as her mother.

20.  Termination of the parent-child relationship is in the best interests of L.G.  Termination would allow her to be adopted into a stable and permanent home, along with her siblings, where her needs will be safely met.

21.  There exists a satisfactory plan for the future care and treatment of L.G., that being adoption.

22.  The Guardian ad Litem recommends the permanency plan of adoption as being in L.G.'s best interest.

*Id*. at 10-11.  Accordingly, the trial court determined that DCS had proven the allegations of the petition to terminate parental rights by clear and convincing evidence and therefore terminated Father's parental rights.  Father now appeals.

# Discussion and Decision

[5]  "The purpose of terminating parental rights is not to punish parents but to protect their children.  Although parental rights have a constitutional dimension, the law allows for their termination when parties are unable or unwilling to meet their responsibility as parents."  *In re S.P.H.*, 806 N.E.2d 874, 880 (Ind. Ct. App. 2004) (citation omitted).  Indeed, parental interests "must be subordinated to the child's interests" in determining the proper disposition of a petition to terminate parental rights.  *In re G.Y.*, 904 N.E.2d 1257, 1260 (Ind. 2009).

[6]  Indiana Code Section 31-35-2-4(b) provides that a petition to terminate parental rights must meet the following relevant requirements:

(2) The petition must allege:

(A) that one (1) of the following is true:

(i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

(ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

(iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

DCS must prove "each and every element" by clear and convincing evidence. *G.Y.*, 904 N.E.2d at 1261; Ind. Code § 31-37-14-2. If the court finds that the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[8] We have long had a highly deferential standard of review in cases involving the termination of parental rights. *In re D.B.*, 942 N.E.2d 867, 871 (Ind. Ct. App. 2011). We neither reweigh the evidence nor assess witness credibility. *Id.* We consider only the evidence and reasonable inferences favorable to the trial court's judgment. *Id.* Where the trial court enters findings of fact and conclusions thereon, we apply a two-tiered standard of review: we first determine whether the evidence supports the findings and then determine whether the findings support the judgment. *Id.* In deference to the trial court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous. *Id.* Clear error is that which "leaves us with a definite and firm conviction that a mistake has been made." *J.M. v. Marion Cnty. Office of Family & Children*, 802 N.E.2d 40, 44 (Ind. Ct. App. 2004), *trans. denied*.

## Section 1 – The trial court's conclusion that there is a reasonable probability that the conditions resulting in L.G.'s removal and continued placement outside Father's care will not be remedied is not clearly erroneous.[2]

[9] We first address Father's contention that the trial court erred in concluding that there is a reasonable probability that the conditions resulting in L.G.'s removal

---

[2] We note that Father also challenges the sufficiency of the evidence to support the trial court's conclusion that there is a reasonable probability that the continuation of the parent-child relationship between Father and L.G. poses a threat to L.G.'s well-being pursuant to Indiana Code Section 31-35-2-4(b)(2)(B)(ii). However, Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive and DCS was required to establish only one of the three requirements of subsection (B). Because we find it dispositive, we need only address whether there is a reasonable probability that the conditions resulting in L.G.'s removal and

and continued placement from his care will not be remedied. Our supreme court recently explained,

> In determining whether the conditions that resulted in the child's removal … will not be remedied, we engage in a two-step analysis. First, we identify the conditions that led to removal; and second, we determine whether there is a reasonable probability that those conditions will not be remedied. In the second step, the trial court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions – balancing a parent's recent improvements against habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect and deprivation. We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. Requiring trial courts to give due regard to changed conditions does not preclude them from finding that parents' past behavior is the best predictor of their future behavior.

*In re E.M.*, 4 N.E.3d 636, 642-43 (Ind. 2014) (citations, quotation marks and some alterations omitted).

[10] In considering the conditions that resulted in L.G.'s removal and continued placement outside of Father's care, the trial court found that L.G. originally became the subject of an informal adjustment with DCS because L.G. was born with drugs in her system. Both Father and Mother were ordered to complete homebased counseling, random drug screens, and a substance use assessment, all with the goal of providing L.G. with a safe, stable, and drug-free

---

continued placement outside Father's care will not be remedied. *See* Ind. Code § 31-35-2-4(b)(2)(B)(i). Father does not challenge the trial court's conclusions or the sufficiency of the evidence regarding the other statutory factors required for termination, and therefore we do not address those factors.

environment. The record indicates that Father failed to participate in virtually any services offered by DCS to meet this goal and he tested positive for THC on multiple occasions. In addition, Father informed DCS that the home he shared with Mother and L.G. was being condemned by the health department and that they were not able to locate other housing. These factors resulted in six-month-old L.G.'s removal from the home.[3]

[11] For almost a year following L.G.'s removal, Father continued to reject the services offered by DCS by missing drug screens, being discharged from substance abuse treatment, failing to attend hearings and meetings, and failing to visit with L.G. Father also failed to address his issues with domestic violence that had come to light during the pendency of the CHINS proceedings. Father gave numerous excuses for his failure to participate in services, including lack of transportation (despite being given two months of bus passes by DCS) or being unaware of scheduled meetings and hearings. At the time of the termination hearing, Father continued to minimize his substance abuse and stated that he did not believe that he needed any substance abuse treatment.

[12] The trial court must consider a parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect or

---

[3] Father argues that there was no evidence that L.G. was ever "endangered" and that her initial removal from the home was unwarranted. First, we are troubled by Father's lack of insight regarding parental behaviors that seriously impair or endanger a child's physical or mental condition. Moreover, we will not revisit the sufficiency of the evidence supporting L.G.'s initial removal. Instead, we identify the conditions that led to L.G.'s removal and continued placement outside of Father's care and we determine whether there is a reasonable probability that those conditions will not be remedied. *See E.M.*, 4 N.E.3d at 642-43.

deprivation. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 152 (Ind. 2005). DCS is not required to rule out all possibilities of change; rather it need only establish "that there is a reasonable probability that the parent's behavior will not change." *In re Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007). Based upon the clear and convincing evidence presented, we defer to the trial court's determination that Father's habitual patterns of conduct and unwillingness to participate in services support a conclusion that there is a substantial probability of future neglect. L.G. was removed from an unstable, unsafe, and drug-filled environment, and Father has done virtually nothing to remedy any of those conditions. The trial court did not clearly err in concluding that there is a reasonable probability that the conditions that resulted in L.G.'s removal and continued placement outside of Father's care will not be remedied.

## Section 2 – The trial court's conclusion that termination of Father's parental rights is in the best interests of L.G. is not clearly erroneous.

[13] Father maintains that the trial court erred in determining that termination of his parental rights is in the best interests of L.G. In determining the best interests of a child, the trial court must look beyond the factors identified by DCS and consider the totality of the evidence. *In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009). "In doing so, the trial court must subordinate the interests of the parent to those of the child." *Id*. Children have a paramount need for permanency, which our supreme court has deemed a central consideration in

determining a child's best interests. *E.M.*, 4 N.E.3d at 647-48. The trial court need not wait until a child is harmed irreversibly before terminating the parent-child relationship. *Id.* We have held that recommendations of the case manager and court-appointed special advocate ("CASA"), in addition to evidence that the conditions resulting in removal will not be remedied, are sufficient to establish by clear and convincing evidence that termination is in the child's best interests. *J.S.*, 906 N.E.2d at 236.

[14] Here, FCM Terra Burns testified that she believed that termination of Father's parental rights is in L.G.'s best interests. She stated that she has concerns for L.G.'s safety if returned to Father's care because Father has failed to address his substance abuse and domestic violence issues, and he has not presented to DCS that he can provide stable housing. She noted that despite the fact that programs and services to help Father had been "referred, re-referred, and re-referred again," Father wholly failed to participate in those services or to visit with L.G. Tr. at 15. Burns noted that L.G. had been in her preadoptive home virtually since birth and "that's what she knows, and it provides her with a safe and stable home." *Id.* at 16. Burns stated that termination was in L.G.'s best interests because "she needs stability." *Id.*

[15] Similarly, CASA Nancy Englert opined that termination of Father's parental rights is in the best interests of L.G. She noted that Father had not participated in services and that he had not visited with L.G. since early 2014. She observed that two-year-old L.G has been placed with her half-siblings in the preadoptive

home since she was six months old, and that she is bonded with her caregiver and half-siblings and is doing very well.

[16] Father does not dispute that L.G.'s preadoptive home is a safe and stable place, but he contends that there is no evidence that he could not also provide L.G. with a safe and stable home. We must disagree. As noted earlier, the record is replete with evidence that, despite ample opportunities, Father has demonstrated no commitment to remedying any of the conditions that resulted in L.G.'s removal from his care and continued placement outside the home. Father has continued to abuse drugs, has failed to demonstrate that he can maintain stable housing, and has not shown an interest in consistently visiting with L.G. L.G. is in need of permanency and cannot wait indefinitely for the safety and stability that Father appears unable and unwilling to provide. Father makes excuses on top of excuses for his failures and urges us to come to a conclusion regarding his fitness as a parent that the record simply does not support. Father's arguments are merely an invitation for us to reweigh the evidence, which we cannot do. *See D.B.*, 942 N.E.2d at 871. Under the circumstances, we cannot say that the trial court's conclusion that termination of Father's parental rights is in the best interests of L.G. is clearly erroneous. Therefore, we affirm the trial court's order terminating Father's parental rights to L.G.

[17] Affirmed.

Brown, J., and Pyle, J., concur.