## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Nov 30 2018, 9:32 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Julianne L. Fox
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Marjorie Lawyer-Smith
Robert J. Henke
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Termination of the Parent-Child Relationship of R.J. (Minor Child) and

J.J. (Mother),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

November 30, 2018

Court of Appeals Case No. 18A-JT-1412

Appeal from the Vanderburgh Superior Court

The Honorable Brett J. Niemeier, Judge

Trial Court Cause No. 82D04-1711-JT-2072

**Mathias, Judge.**

[1] J.J. ("Mother") appeals the Vanderburgh Superior Court's termination of her parental rights. She argues that the Department of Child Services ("DCS") failed to present sufficient evidence to support the trial court's conclusions of law.

[2] We affirm.

## Facts and Procedural History

[3] When she arrived at the hospital to deliver the child ("R.J.") on June 30, 2016, Mother tested positive for marijuana. The baby's umbilical cord tested positive for both THC and cocaine. Mother received no prenatal care in the first six months of her pregnancy. DCS became involved shortly after birth, and, based on its preliminary investigation, removed R.J. On July 11, 2016, DCS filed a Child in Need of Services ("CHINS") petition, to which Mother admitted. A hair follicle test taken shortly thereafter showed that Mother had used cocaine in each of the past three months.

[4] The CHINS court ordered Mother to participate in parent aide sessions, complete a substance abuse evaluation and follow all treatment recommendations, participate in parenting classes, attend supervised visitation, and remain drug and alcohol free. However, throughout the course of the CHINS proceedings, Mother struggled to comply with the court's orders. She also accumulated several arrests and convictions.

[5] In 2017 and 2018, Mother was arrested, charged, or convicted of the following:

A. Mother was arrested for operating a vehicle while intoxicated and intimidation on May 3, 2017. On August 8, 2017, Mother pleaded guilty to operating a vehicle while intoxicated, and her intimidation charge was dismissed. As a result of her guilty plea, Mother was placed on probation until August 4, 2018;

B. Mother failed to appear in this matter on June 5, 2017, and the trial court issued a warrant. This warrant was served on Mother when she was in the Daviess County jail on a separate warrant from that county. The Daviess County matter involved two misdemeanors that were later deferred through a diversion program;

C. On November 4, 2017, Mother was arrested for resisting law enforcement, operating a vehicle while intoxicated, leaving the scene, and an enhanced operating a vehicle while intoxicated due to a prior conviction. She was still on probation at the time of this arrest. As of March 13, 2018, these charges were still pending;

D. On March 15, 2018, Mother was arrested for criminal recklessness-shooting into a dwelling, criminal recklessness with a deadly weapon, battery by bodily waste, intimidation, and carrying a handgun without a permit.

E. DCS records also showed a level 6 felony charge in Jackson County. The trial court was unsure of details regarding this charge.

[6] Mother was irregular in her participation in substance abuse therapy. Mother missed so many appointments that she was placed on a schedule where she had to call the day-of to see if any appointments were available. She never completed her sessions. Mother also tested positive for THC on several drug screens. She failed to show up for approximately forty-five drug screens.

[7] Mother was also inconsistent with visitation throughout the duration of the CHINS proceedings. She did not visit R.J. at all between September 2016 and February 2017. Mother missed approximately half of the visits scheduled between February and April of 2017. Mother attended two visits in May of 2017, and then visits were suspended while Mother was incarcerated in Daviess County. After her release, Mother attended visitations, but they were placed on hold due to Mother's threats of violence toward the visitation supervisors. Once visits resumed, Mother attended visitation regularly for a period of time. She missed some visits prior to her last arrest in March of 2018, as well as the visit that was scheduled for the day after she was arrested. She was unable to visit while incarcerated. She was still incarcerated at the time of the termination hearing.

[8] When Mother did attend visits, she was often inappropriate and occasionally threatening to the workers who supervised visitation. She resisted learning the skills the workers attempted to teach her. On more than one occasion, Mother indicated she might run away from visitation with the baby. One of the service providers insisted that if Mother continued to threaten its workers, it would discontinue services due to concerns for worker safety.

[9] The DCS family case manager ("FCM") expressed concern that Mother did not take R.J.'s medical condition seriously during the visitations. R.J. was diagnosed with laryngomalacia, which means that her larynx did not develop correctly. As a result, doctors recommended that R.J. not be around cigarette smoke nor be exposed to people with residue from cigarette smoke on their clothing. In spite of being told about this condition, Mother would come to visitation smelling of smoke, and would even change R.J. into clothing that smelled of smoke that Mother had brought with her to the visitation. The FCM reminded Mother of the condition and R.J.'s sensitivity to residue from cigarette smoke; however, Mother did not make the necessary changes. On at least one occasion, R.J.'s condition flared up after a visit, resulting in the foster parents having to take R.J. to the emergency room for immediate medical attention.

[10] The trial court ordered Mother to take nurturing classes. The trial court also granted Mother's request not to have parent aid or outpatient mental health therapy. While DCS placed the referral for the ordered nurturing course, Mother did not believe she needed any parenting skills and never completed any nurturing classes.

[11] Mother also had difficulty maintaining a steady income and stable housing. At the time the CHINS proceedings were initiated, Mother lived with the child's

father.[1] Father moved to Indianapolis shortly after the CHINS proceedings were initiated. Mother requested that the case be transferred to Marion County; however, jurisdiction was unable to be transferred. When Father moved to Indianapolis, Mother became homeless. A parent aide provided by DCS assisted Mother with obtaining a place in a shelter. Mother threatened this parent aide. She was asked to leave the shelter due to fighting. Mother then moved to Indianapolis in spite of knowing that the CHINS matter was unable to be transferred.

[12] After a short period of time in Indianapolis, Mother moved in with R.J.'s maternal grandmother ("Grandmother") and Grandmother's wife in Vigo County. Grandmother has a significant criminal history and was arrested as recently as November 2017 for strangulation and domestic battery. Grandmother's criminal history disqualified the home from being approved for placement.

[13] At the time of the termination hearing, Mother was incarcerated. Mother testified that she had worked as a dancer in a club when she first moved to Vigo County and had some savings to pay for housing and home detention costs upon release. Mother indicated that she worked for a period of time in customer service for a phone company, a position a parent aide helped her obtain.

---

[1] Aside from attending a few visitations early in the proceedings, Father has not participated in the CHINS proceedings or services. At the time of Mother's termination hearing, a warrant had been issued for his arrest, and his whereabouts were unknown. A publication hearing had been set for August 23, 2018 regarding termination of Father's parental rights.

However, Mother never provided income verification to the FCM. Mother also did not have a valid driver's license.

[14] The FCM believed a continuation of the parent-child relationship posed a threat to the child's well-being. She stated that R.J. and Mother did not have a bond and that R.J. would become upset when it would be time to go to visitation. R.J. would have nightmares after visitation. The FCM also believed R.J. to be bonded to her pre-adoptive foster parents.

[15] The Court Appointed Special Advocate (CASA) agreed with the FCM. She believed it is in the best interest of the child for parental rights to be terminated and for the child to be adopted. Mother was often hostile toward the CASA, even spitting at her on one occasion. The CASA reported that the child did not tolerate visits with Mother well. The child recognized the backpack that the foster mother sent on visits and cried when she saw it and said "no."

[16] On May 18, 2018, the trial court held a hearing regarding the termination of Mother's parental rights. On May 23, 2018, the court entered an order terminating Mother's parental rights to R.J. The trial court stated, in relevant part:

> 4. The child has been removed from the parent and has been under the supervision of the department for at least 6 months under a dispositional decree in cause number 82D04-1607-JC[-]1226, specifically the child was removed at the onset of the CHINS case and never returned to the mother. The child has also been out of the mother's care for at least 15 months out of the last 22 months as a result of the child's CHINS case.

a. There is a reasonable probability that the conditions that resulted in the child's removal or continued placement outside the home of the parent will not be remedied as mother has shown little signs of consistency and improvement on any of the issues that she faces. The mother has repeatedly been arrested no matter what is at stake. It doesn't seem to matter whether there are Court orders, upcoming criminal hearings, child placement hearings, her parental rights being at stake, or [even her] freedom: she continues to defy numerous Court orders and gets arrested. This Court believes the mother showed her true self when early on in the CHINS case she left town and chose not to visit her newborn for several months.

b. There is a reasonable probability that the continuation of the parent-child relationship between the mother and the child poses a threat to the child's well-being as no child cannot be [a]ffected by a parent who has the instability and problems that the mother faces.

c. Termination of the parent-child relationship between the mother and the child is in the best interests of the child as the child needs the stability and loving environment that the child current [sic] has.

Appellant's App. pp 4–5. Mother appeals, arguing that DCS failed to present sufficient evidence to support the trial court's conclusions.

## Discussion and Decision

[17] We have often noted that the purpose of terminating parental rights is not to punish parents but instead to protect their children. *In re S.P.H.*, 806 N.E.2d 874, 880 (Ind. Ct. App. 2004). Although parental rights are constitutionally

protected, the law allows for the termination of such rights when parents are unable or unwilling to meet their responsibility as parents. *Id.* Indeed, a parent's interest must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights. *In re G.Y.*, 904 N.E.2d 1257, 1259 (Ind. 2009). The court need not wait until a child is harmed irreversibly before terminating the parent-child relationship. *In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009).

[18] The termination of parental rights is controlled by Indiana Code section 31-35-2-4(b)(2), which provides that a petition to terminate parental rights must allege:

> (A) that one (1) of the following is true:
>
>> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
>>
>> (ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.
>>
>> (iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;
>
> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for

placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

[19] The burden is on DCS to prove each element by clear and convincing evidence. I.C. § 31-37-14-2; *G.Y.*, 904 N.E.2d at 1260–61. However, as Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, the trial court is required to find that only one prong of that subsection has been established by clear and convincing evidence. *In re A.K.*, 924 N.E.2d 212, 220 (Ind. Ct. App. 2010). If the court finds the allegations in a petition are true, the court shall terminate the parent-child relationship. I.C. § 31-35-2-8(a). If the court does not find that the allegations in the petition are true, it shall dismiss the petition. *Id*. at § 8(b).

[20] A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, will support a finding that there exists no reasonable probability that the conditions will change. *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005). An inability to provide adequate housing, stability, and supervision, combined with the current inability to provide the same, will support a finding that continuation of the parent-child relationship is contrary to the child's best

interests. *Id.* Indeed, a factfinding court, "recognizing the permanent effect of termination . . . must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the children." *In re D.G.*, 702 N.E.2d 777, 779 (Ind. Ct. App. 1998).

[21] We have long had a highly deferential standard of review in cases involving the termination of parental rights. *In re D.B.*, 942 N.E.2d 867, 871 (Ind. Ct. App. 2011). We neither reweigh evidence nor judge witness credibility. *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014). Rather, we consider only the evidence and inferences most favorable to the judgment. *Id.* When we review a trial court's findings of fact and conclusions of law in a case involving the termination of parental rights, we first determine whether the evidence supports the findings; secondly, we determine whether the findings support the judgment. *A.D.S. v. Indiana Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied*.

[22] "[I]t is not enough that the evidence might support some other conclusion, but it must positively require the conclusion contended for by the appellant before there is a basis for reversal." *Best v. Best*, 941 N.E.2d 499, 503 (Ind. 2011) (citations omitted). "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Id.* at 502 (quoting *Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind. 1997)). If the evidence and inferences support the trial court's decision, we must affirm. *Id.* at 503.

# I. Remedy of Conditions Resulting in Removal

[23] Mother argues that DCS failed to show a reasonable probability that the conditions that resulted in the removal of the child will not be remedied. To determine whether conditions are likely to be remedied, the trial court must examine a parent's fitness to care for his or her child as of the time of the termination hearing, taking into account any evidence of changed conditions. *In re S.P.H.*, 806 N.E.2d at 881. Additionally, the court must look at the services offered as well as the parent's response in meeting their responsibilities. *In re R.H.*, 892 N.E.2d 144, 150 (Ind. Ct. App. 2008).

[24] In support of its conclusion that a reasonable probability existed that the conditions that resulted in the child's removal or continued placement outside of the home will not be remedied, the trial court relied on several different indicators. Namely, the court pointed to Mother's repeated arrests, making the choice not to visit her newborn for several months by moving out of town, and Mother's lack of consistency and progress on any of the issues she faces. Appellant's App. pp. 4–5.

[25] The proceedings in this matter began with the filing of a CHINS on July 11, 2016. It concluded with a termination hearing on April 19, 2018. In between, Mother had nearly two years during which a multitude of services and opportunities for assistance were made available to her. However, instead of complying with the court and working to become sober and stable in order to be able to provide for her child, Mother fought with service providers, failed or missed drug screens, resisted services, was inconsistent in attending substance

abuse therapy, and accumulated a number of substance abuse-related arrests and convictions.

[26]     Mother argues that DCS failed to establish appropriate services for her. Our review of the services provided and Mother's response to the services convinces us that Mother was provided with more than sufficient opportunity to remedy the conditions that resulted in the child's removal and she simply failed to do so. When Mother requested that the case be transferred to Marion County, Mother was already noncompliant with services. At an August 17 disposition hearing, Mother objected to several services being offered by DCS. In another incident, a parent aide was able to assist Mother in procuring a place at a shelter when she became homeless in Vanderburgh County. However, Mother threatened this parent aide and was asked to leave the shelter. Mother then left Vanderburgh County. Although the case was later transferred to Vigo County, and services became available to her in Vigo County, Mother failed to participate with any consistency and continued with her criminal behavior.

[27]     As such, we cannot find error with the trial court's conclusions that a reasonable probability exists that the conditions resulting in removal will not be remedied. Because the statute only requires DCS to prove either subsection (i) or (ii) of Indiana Code section 31-35-2-4(b)(2), and subsection (i) has been established, we do not need to reach a conclusion regarding the court's conclusion with respect to subsection (ii). *A.K.*, 924 N.E.2d at 220.

## II. Best Interest of the Child

[28]     Mother also challenges the trial court's findings in Paragraph 4(c), which concludes that termination is in the best interest of the child, as required by Indiana Code section 31-35-2-4(b)(2)(c). In reaching this conclusion, the trial court noted that the child needed to continue in the stable and loving environment in which R.J. was placed.

[29]     The evidence demonstrated that R.J. had developed anxiety about visitation with Mother, saying "no" when R.J. saw the backpack the foster parents regularly sent with R.J. to visitation. R.J. would also have nightmares after visitation. Mother disregarded doctor's recommendations regarding R.J.'s medical needs. Mother engaged in substance-related criminal activity, was incarcerated repeatedly, resisted services, failed drug screens, and failed to follow up with her substance abuse treatment. The evidence clearly demonstrated Mother is unable to provide R.J. with a safe and stable home.

[30]     R.J. was happy and flourishing in her pre-adoptive placement. She was meeting all developmental milestones, and the foster parents were attentive to R.J.'s medical needs. The child was bonded to her foster parents, and the FCM believed R.J. saw her foster parents as her parents. More than sufficient evidence existed for the trial court to conclude that termination was in the best interests of the child.

# Conclusion

[31] For the duration of nearly two years of reunification efforts, Mother struggled with sobriety and stability. She either failed or refused to engage in services and was unable to meet the needs of the child. For these reasons, we affirm the trial court's termination of J.J.'s parental rights.

[32] Affirmed.

Bailey, J., and Bradford, J., concur.