# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 26 2019, 10:24 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Karen E. Wrenbeck
Molly J. Turner-King
Office of the Monroe County
Public Defender
Bloomington, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Tiffany A. McCoy
Robert J. Henke
Deputy Attorneys General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

In re the Termination of the Parent-Child Relationship of Sh.R., Si.R., D.A., and F.R. (Minor Children) and

A.P. (Mother)[1],

*Appellant-Respondent,*

v.

March 26, 2019

Court of Appeals Case No.
18A-JT-2221

Appeal from the Monroe Circuit Court

The Honorable Holly M. Harvey, Judge

Trial Court Cause Nos.
53C04-1704-JT-346
53C04-1704-JT-347

---

[1] S.R. (Father of Sh.R., Si.R., and F.R.) filed a pro se Notice of Appeal in this matter but has not filed an appellate brief or otherwise participated on appeal. R.P. (Father of D.A.) also filed an appeal (No. 18A-JT-2243) that has since been dismissed. However, pursuant to Indiana Appellate Rule 17(A), a party of record in the trial court shall be a party on appeal.

| Indiana Department of Child Services, | 53C04-1704-JT-348 |
| | 53C04-1704-JT-349 |
| *Appellee-Petitioner.* | 53C06-1704-JT-346 |
| | 53C06-1704-JT-347 |
| | 53C06-1704-JT-348 |
| | 53C06-1704-JT-349 |

**Mathias, Judge.**

[1] A.P. ("Mother") appeals the Monroe Circuit Court's termination of her parental rights. She presents three separate issues which we restate as whether the trial court's decision terminating her parental rights was clearly erroneous.

[2] We affirm.

## Facts and Procedural History

[3] Mother is the mother of D.A., Sh. R., F.R., and Si.R. R.P. is the Father of D.A. S.R. is the Father of Sh.R., F.R., and Si.R. In July of 2015, the Indiana Department of Child Services ("DCS") received a report of a domestic abuse allegation between Mother and R.P. Mother had injuries to her face caused by R.P. Mother testified that R.P. had shoved her out of a van. As a result of this incident, DCS and the family entered into an Informal Adjustment ("IA"). As a part of the IA, the family participated in therapy.

[4] Approximately four months after the commencement of the IA, DCS filed a petition alleging that the children were Children in Need of Services ("CHINS"), and the children were removed from the care of Mother and R.P.

At the fact-finding hearing held in the CHINS matter, D.A. testified regarding sexual molestation she suffered by R.P. This molestation occurred in the house and the family van. D.A. did not tell anyone about the ongoing molestation for approximately two and a half years. When she did tell Mother, Mother decided to "keep it in the family." Ex. Vol. I, Ex. 4, p.17. D.A. also testified she had witnessed R.P. strike Mother while he was drinking and that she had found Mother on the floor with her glasses broken. Mother testified that she had bruising on each side of her face caused by R.P. because R.P. was sleepwalking. Mother also testified that she instigated R.P. and that she has a vitamin deficiency that makes her bruise easily. The CHINS court did not accept Mother's testimony as truthful. *Id.*

[5] The court adjudicated the children CHINS the day of the fact-finding hearing and held a dispositional hearing on October 24, 2016. The dispositional orders required each parent to address the needs of the children to reside in a safe and stable home, free from sexual abuse, domestic violence, and substance abuse. The juvenile court also ordered Mother not to permit R.P. to have contact with the children. Ex. Vol. I, Ex. 4. p. 25. The court maintained placement outside of Mother's home. After some time, the permanency plan for the children was changed from reunification to adoption, and on April 19, 2017, DCS filed a Petition to Terminate Parental Rights. On April 23, 2018, and May 29, 2018, the trial court conducted a fact-finding hearing on the termination. On August 20, 2018, the trial court issued an order terminating the parental rights between Mother and her four children. Mother now appeals.

# Legal Analysis

We have often noted that the purpose of terminating parental rights is not to punish parents but instead to protect their children. *In re S.P.H.*, 806 N.E.2d 874, 880 (Ind. Ct. App. 2004). Although parental rights are constitutionally protected, the law allows for the termination of such rights when parents are unable or unwilling to meet their responsibility as parents. *Id.* Indeed, a parent's interest must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights. *In re G.Y.*, 904 N.E.2d 1257, 1259 (Ind. 2009). The court need not wait until a child is harmed irreversibly before terminating the parent-child relationship. *In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009).

The termination of parental rights is controlled by Indiana Code section 31-35-2-4(b)(2), which provides that a petition to terminate parental rights must allege:

> (A) that one (1) of the following is true:
>
> > (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
> >
> > (ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.
> >
> > (iii) The child has been removed from the parent and has been under the supervision of a local office or probation

department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

[8] The burden is on DCS to prove each element by clear and convincing evidence. I.C. § 31-37-14-2; *G.Y.*, 904 N.E.2d at 1261. However, as Ind. Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, the trial court is required to find that only one prong of that subsection has been established by clear and convincing evidence. *In re A.K.*, 924 N.E.2d 212, 220 (Ind. Ct. App. 2010). If the court finds the allegations in a petition are true, the court shall terminate the parent-

child relationship. I.C. § 31-35-2-8(a). If the court does not find that the allegations in the petition are true, it shall dismiss the petition. *Id.* at § 8(b).

[9] A parent's historical inability to provide a suitable environment along with the current inability to do the same supports a finding that termination of parental rights is in the best interest of the children." *Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d 366, 373 (Ind. Ct. App. 2007), *trans. denied*. Indeed, a fact-finding court, "recognizing the permanent effect of termination . . . must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the children." *In re D.G.*, 702 N.E.2d 777, 779 (Ind. Ct. App. 1998).

[10] We have long had a highly deferential standard of review in cases involving the termination of parental rights. *In re D.B.*, 942 N.E.2d 867, 871 (Ind. Ct. App. 2011). We neither reweigh evidence nor judge witness credibility. *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014). Rather, we consider only the evidence and inferences most favorable to the judgment. *Id.* When we review a trial court's findings of fact and conclusions of law in a case involving the termination of parental rights, we first determine whether the evidence supports the findings; secondly, we determine whether the findings support the judgment. *A.D.S. v. Indiana Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied*.

[11] "[I]t is not enough that the evidence might support some other conclusion, but it must positively require the conclusion contended for by the appellant before

there is a basis for reversal." *Best v. Best*, 941 N.E.2d 499, 503 (Ind. 2011) (citations omitted). "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Id*. at 502 (quoting *Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind. 1996)). If the evidence and inferences support the trial court's decision, we must affirm. *Id*. at 503.

[12]   Here, the trial court concluded that "[t]here is a reasonable probability that the conditions which resulted in the removal of the child, or the reasons for placement outside the home of the parents, will not be remedied, and/or, the continuation of the parent-child relationship poses a threat to the well-being of the child." Appellant's App. pp. 32–33. In support of this conclusion of law, the trial court noted the following:

> [S.R.] continues to test positive for controlled substances and has not complied with the dispositional orders of the Court. He has not demonstrated an ability to care for the children.
>
> [R.P.] continues to blame [D.A.] for his involvement with these proceedings, and accuses her of lying about the disclosures of sexual molestation. [R.P] has a lack of empathy for [D.A.]. [R.P.] distrusts the Department of Child Services, and any further services offered for the family will not likely be effective, due to [R.P.]'s belief that the DCS is trafficking the children.
>
> [Mother] does not believe that domestic violence occurred in her home. [Mother] minimized the effect of the fighting between herself and [R.P.]  and did not believe that it negatively affected the children. [Mother] believes [D.A.] is lying about being molested, and believes that [D.A.]'s subsequent self-harm and treatment at Meadows Hospital were a result of [D.A.] feeling

guilty. [Mother] maintains that because there is no physical evidence of molestation, but only [D.A.]'s word, molestation did not occur. [Mother] could not articulate what steps she would take if further abuse occurs in the event the children are returned to the home, and may not believe the children if physical evidence of abuse is absent. [Mother]'s inability to specifically state what she would do if the children reported sexual abuse to her makes it unlikely that she will be able to protect the children from future abuse. [Mother]'s lack of empathy towards [D.A.] and unfailing loyalty toward [R.P.] shows an unlikelihood that [Mother] would protect [D.A.] from further abuse.

The lack of internalization of responsibility by [R.P.] and [Mother] will likely make further services unhelpful.

Appellant's App. p. 33.

[13] The parties do not dispute, and the trial court found, that Mother was actively participating in services. Family Case Manager ("FCM") Krista Wright testified that:

The activities, the preparedness for the visits have never been a concern for DCS. The major concern for DCS is mom not believing the allegations of sexual abuse and returning the children home with mom who is still with the person who has abused the child. Participation in services have been outstanding according to provider reports. Parents have shown up for meetings with DCS. Parents have been on time for reports. Her, her report with the visitation agency and her providers have been, um, noted as good. The concern for DCS is the minimizing of the domestic violence and the ongoing denial of the allegations of sexual abuse and the findings that sexual abuse has taken place. That is our major concerns [sic], not her participation in services.

Tr. Vol. I, p. 243. FCM Wright further stated that Mother never reported to her that she would file for divorce, get a protective order, move out, or otherwise leave R.P. *Id.*

[14] Therapist Jacqueline Jordan ("Jordan") testified as well. She engaged Mother and R.P. in therapy at the beginning of the case, as well as all of the children throughout the matter. She testified that she talked with Mother and R.P. about the impact of domestic violence on children but did not receive the impression that Mother and R.P. internalized the information since they did not believe it applied to them. Jordan testified that Sh.R. made a disclosure to her about having been molested prior to DCS involvement with the family, and Si.P. indicated R.P. had pulled him out of bed by his hair. D.A. had also disclosed she had been pulled down a hallway by either Mom or R.P. Jordan also testified that D.A. has depression, post-traumatic stress disorder ("PTSD"), has suicidal thoughts, and cuts herself. She believed that Mother and R.P.'s lack of belief in D.A. and lack of support for her contributes to D.A.'s diagnoses and symptoms.

[15] Jay Cimmer ("Cimmer"), who served as therapist to R.P. and Mother, stated, "I would say that there was not an expression of empathy towards what the kids were going through." Tr. Vol. I, p. 162. He confirmed that Mother and R.P. did not internalize that the children had suffered any abuse and that Mother and R.P. were not open to the possibility that the children had suffered any abuse in therapy. He has not seen Mother show any compassion for D.A.

He observed that Mother blames herself for R.P.'s behavior and that Mother has not discussed moving on from him in a long time.

[16] Melissa Scott, a home-based case manager who worked with the children to help them identify and regulate emotions and develop coping skills, also testified. Specific to D.A., Ms. Scott testified that before court proceedings, "[D.A.] will often start to feel extremely anxious. She starts to have more intrusive thoughts. Um, thoughts that surround, ah, shower time. Thoughts that, um, her mother is going to hurt herself or be hurt by someone. Um, and she'll have a lot of nightmares that'll keep her up all night. And then after those things happen, then she'll start to, um, cycle and, and she will often end up in Valley Vista or Meadows." Tr. Vol. II, p. 64. She testified that she understood that the court had ordered R.P. to have no contact with D.A. Ms. Scott observed D.A. have a "hyper-emotional" reaction after D.A. inadvertently saw R.P. at the hospital when D.A. went to visit her sick grandmother. Ms. Scott also testified that she believed terminating parental rights and adoption is in the best interest of the children.

[17] The Court Appointed Special Advocate ("CASA"), Ivaetta McCammon, testified that she met with the children once a month for twenty months and has reviewed all of the documents in the file. She met with Mother at about six different Child and Family Team Meetings, has spoken to her at hearings, and observed three visitations with the children where Mother was present. R.P. was also present on all of these occasions except for the visitations with the children.

[18] CASA McCammon expressed concern that Mother had made statements to her that R.P. was her source of income. She was less concerned at the time of her testimony because Mother had since secured employment; however, Mother's employment does not fully alleviate her concerns because Mother does not drive. CASA McCammon testified she had seen a recent Facebook post from Mother that stated, "my daughter's lying on us." Tr. Vol. II, pp. 18, 30. She also observed a "live feed" on a Facebook page entitled "Parents Fight DCS in Indiana" managed by Mother where Mother said "that her daughter, a teen daughter, ah, didn't get her way and we put our foot down that's why she's, why we're involved in this." *Id.* at 18. CASA McCammon's impression throughout the time that she been assigned to the case that D.A. was incredibly "hurt" and that D.A. does not trust her parents.

[19] The CASA was also concerned that Mother had established a pattern of being involved in unhealthy relationships where domestic violence, drugs, and alcohol were involved and that she had chosen these relationships over the safety of her children. The CASA stated, "[s]he's been, ah, in relationships that were not conducive to, ah, being a good parent and, um, as well as she is staying in the situation she is in I, I would not want her to have the children." *Id.* at 20–21. She was also concerned about R.P.'s drug screens and his driving under the influence with endangerment arrest. In March of 2017, she saw R.P.'s picture in the newspaper as involved with prostitutes. She did not believe that the reasons for removal had been remedied and believed that, although the

parents had benefited some from the services provided, the children being placed back with Mother and R.P. posed a threat to their well-being.

[20] Mother testified that she did not believe that D.A. showed any signs of abuse, although she was present in the court room in the CHINS proceeding when D.A. testified that R.P. molested her. Mother further testified that D.A. said told her she lied when she testified about the molestation in court and that D.A. told her that D.A. believed she should not have said what she did in court. Mother believed that DCS is "involved in kidnapping a lot of children and with the IVD Title Four stealing their Social Security." Tr. Vol. I, p. 105.

[21] R.P. testified that he remembered D.A. testifying in the CHINS proceeding that R.P. had become sexual in his relationship with her, but he denied the specific allegations. He believed that DCS sought to terminate his parental rights because DCS is trafficking the children and "want[s] the money of my kids." *Id.* at 67. He acknowledged he had a temper and had pushed A.P. out of a van and that this act was domestic violence, but he denies that he did anything in front of the children. He testified he did not believe he would do something that like that again. He admitted to being arrested to driving under the influence and endangering a person as well as being convicted for possession of a stun gun in the commission of a crime. He also admitted hitting his brother-in-law.

[22] After a review of the evidence presented, we conclude that there was more than sufficient evidence for the trial court to determine that the continuation of the parent-child relationship poses a threat to the well-being of the children.

Because DCS is only required to prove one prong of Indiana Code Section 31-35-2-4(b)(2)(B), we do not address the question of whether the conditions that resulted in the children's removal have been remedied.

[23] In terminating Mother's parental rights, the trial court also concluded that termination of the parent-child relationship is in the best interests of the children. In support of this conclusion of law, the trial court stated:

> [Sh.R., Si.R., and F.R] are doing well in their placement. They have not seen S.R. since 2016. [Sh.R., Si.R., and F.R.] have demonstrated improvement in their education and their emotional well-being since being removed from the home. [D.A.] has demonstrated self-harming behaviors at the prospect of court proceedings and her mental health requires that the proceedings be resolved. [D.A.] has consistently maintained that [R.P.] sexually molested her. [Mother] does not support [D.A.]. [D.A.] is not safe in [R.P.]'s home, and [Mother] has not indicated a willingness or ability to protect [D.A.] or the other children. The children need stability, protection from further abuse, and resolution to the proceedings.

Appellant's App. pg. 33.

[24] Here, the evidence supports this conclusion. The home-based case manager testified that the children had made strides academically and in identifying and regulating emotions. R.P. and Mother both denied that R.P. had molested D.A. Multiple parties testified regarding the harm the proceedings have had on D.A., Mother's lack of belief in her allegations of abuse by R.P, and Mother's lack of support for D.A.

Mother does not contest that the children have been removed from her care and custody pursuant to a disposition decree for more than six months and have continued to be placed outside her care and custody for more than fifteen of the last twenty-two months. Mother also does not contest that adoption is a satisfactory plan for the children's permanency. We therefore do not address these issues on appeal.

## Conclusion

Sufficient evidence supported the trial court's conclusion that continuation of the parent-child relationship posed a threat to the well-being of the children and that termination of Mother's parental rights is in the best interest of the children. Accordingly, we conclude the trial court's termination of Mother's parental rights was not clearly erroneous.

Affirmed.

Vaidik, C.J., and Crone, J., concur.